**NOT RECOMMENDED FOR PUBLICATION**

File Name: 04a0105n.06

Filed: November 18, 2004

**No. 03-5609**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

STEVEN M. MEADOWS,

     Plaintiff-Appellant,

v.

MARK THOMAS, ET. AL.,

     Defendants-Appellees.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY

_____/

BEFORE:    KEITH and CLAY, Circuit Judges; OBERDORFER, District Judge.[*]

    **DAMON J. KEITH, Circuit Judge.**  Plaintiff-Appellant Steven Meadows ("Meadows")

appeals summary judgment for the defendants-appellees in this civil rights action alleging false

arrest, excessive force, illegal search and seizure, and malicious prosecution.  For the reasons that

follow, we AFFIRM the district court's decision.

**I.  BACKGROUND**

**Procedural**

    On March 28, 2002, Meadows filed this action, pursuant to 42 U.S.C. § 1983, against

Kentucky State Police ("KSP") Officers Mark Thomas ("Thomas"), Kristie Sexton ("Sexton"), and

a "John Doe" unknown defendant, in their individual capacities, alleging that his arrest and detention

_____

    [*] The Honorable Louis F. Oberdorfer, United States District Judge for the District of
Columbia, sitting by designation.

on March 30, 2001, and the non-consensual, warrantless search of his vehicle violated his Fourth Amendment right to be free from unreasonable searches and seizures. Additionally, Meadows asserted a claim of excessive force in that the handcuffs had been applied too tightly, resulting in an injury to his wrist. Meadows also asserted a state law claim for false arrest and malicious prosecution. The district court, Chief Judge Karl Forester, reassigned the case to Magistrate Judge James B. Todd on June 6, 2002, to which the parties consented on June 13, 2002. Magistrate Judge Todd ordered the issues in the case briefed and held an evidentiary hearing on December 27, 2002. On April 11, 2003, the district court granted Thomas and Sexton's motion for summary judgment based upon the defense of qualified immunity. Meadows filed a timely appeal from the district court's order.

**Factual**

On March 30, 2001, Meadows drove from his home in Cynthiana, Kentucky, where he was a professional truck driver, to work in Lexington, Kentucky. Meadows drove for ten hours that day and then worked on the dock for several hours after he returned to Lexington. After working approximately fifteen hours, he started for home around 8:00 p.m. Near the Fayette-Bourbon County line, Meadows came upon a Ford Explorer that was driven by then-off-duty Trooper Thomas, with his then-fiancé, Trooper Tracey Collins ("Collins") in the passenger seat.

According to Thomas, Meadows's vehicle passed several cars in a marked no-passing zone, and crossed the highway centerline on several occasions. J.A. at 15. Following Thomas's vehicle, Meadows came to a four-way stop sign at the intersection of KY 353 and US 460. Thomas and Meadows both claim that the other did not adhere to the stop sign. Continuing on, approximately fifteen feet from Thomas's driveway, located 182 feet from the intersection, Thomas's vehicle

slowed and then came to a stop before turning into the driveway of his home. Meadows, whom Thomas claims was tailgating him, almost hit Thomas's vehicle and the vehicle behind Meadows almost struck his Dodge Dakota pickup truck. J.A. at 16.

After parking in his driveway, Thomas went into his home to notify KSP Post 6 of the description of Meadows's vehicle and to report him as a possible driving under the influence of an intoxicant ("DUI") suspect (he alleges that he did not make the call because he noticed Meadows's vehicle in his private driveway). J.A. at 17. Apparently, down the road, Meadows had pulled over the vehicle behind him and checked to see if he had hit Meadows's truck. After taking down the address and cell phone of Bradley Scott Hamilton, the driver behind him, Meadows turned around and headed to Thomas's driveway, where, according to him, he planned to "discuss" the issue of Thomas's "poor driving." Appellants Br. at 10. Thomas testified that, upon approaching Meadows, he was met by profanity from Meadows. J.A. at 17. Thereafter, Thomas produced his badge and presented himself as a KSP Trooper and then requested to see Meadows's vehicle registration, proof of insurance, and operator's license. *Id.* Meadows did not comply with this request and, after Thomas made a second request, Meadows stated that he did not have to comply, that he had recorded the conversation, and that he was going to call the KSP post to complain about Thomas's driving. *Id.*

Meadows claims that he informed Thomas that he was going to the gas station located 200 feet down the road, where he was to call the KSP. Meadows did leave and Thomas observed him go to a gas station down the road. According to Meadows, when he arrived at the gas station, he did not have enough change to place a call. Appellant's Br. at 10. Meadows claims that he proceeded toward Cynthiana with the intention of calling the KSP from his home. *Id.*

At this time, Thomas and Collins entered Thomas's KSP cruiser and began to back out of the driveway.  After observing Meadows's vehicle exit the gas station and proceed past Thomas's driveway, Thomas and Collins pulled out of his driveway in his KSP cruiser and followed Meadows for no more than a mile and then turned on his blue lights.  J.A. at 18.

After pulling Meadows over, Thomas again told Meadows to produce his vehicle registration, proof of insurance, and operator's license.  *Id.*  At this point, Thomas noticed that Meadows's eyes appeared red and glazed.  Appellees' Br. at 4.  Thomas testified that, after Meadows was unable to promptly produce the items and because Meadows appeared confused, he requested that Meadows exit the vehicle.  J.A. at 18.  According to Meadows, there was a spotlight in his eyes as he was exiting the vehicle, which he implies caused him to drop his driver's license when he climbed out of the vehicle. Appellant's Br. at 11.  Thomas requested that Meadows pick up his driver's license and claims that as Meadows went to do so, he stumbled and nearly fell to the ground.  J.A. at 19. At this point, Thomas advised Meadows that he was under arrest for DUI and requested that Meadows move to the rear of his truck.  *Id.*

Meadows was asked to perform field sobriety tests, including a one leg stand, which Meadows refused, allegedly telling Thomas that he had a bad leg.  Appellant's Br. at 11.  Meadows alleges that he asked Thomas to give him a Breathalyzer test and that Thomas stated that he was not equipped to give the test.  *Id.*  Although Thomas acknowledged that he did not smell alcohol on Meadows, Thomas was under the belief that Meadows was under the influence of some other intoxicant. J.A. at 19.  Thomas claims that his belief that Meadows was under the influence of an intoxicant other than alcohol based on Meadows's: (1) illegal passing of vehicles on KY 353; (2) running of the stop sign; (3) reckless driving (tail gaiting); (4) trespass on Thomas's property; (5)

alleged obscene verbal confrontation; (6) refusal to produce identification for a known law enforcement officer; (7) behaviors displayed while exiting the vehicle; and (8) refusal to participate in field sobriety tests. Appellees' Br. at 5-6.

During the course of the traffic stop, Collins, who had remained in the KSP cruiser, radioed KSP Post 6 and requested that the Post send a trooper for a traffic stop and to come by and assist. J.A. at 20. Thomas placed Meadows under arrest and handcuffed him, employing the accepted method of placing his pinky finger between the handcuffs and the wrist to ensure proper spacing. *Id*. Shortly after arresting Meadows, three other KSP cruisers arrived. *Id*. Sexton was one of the KSP troopers who arrived. Thomas relayed his information – including Thomas's observations of Meadows's driving, his red eyes, his refusal to take the field sobriety tests, and his difficulty in exiting his vehicle – to Sexton. J.A. at 21. Based upon this information and her own personal observations, which included Meadows's "red, glossy eyes . . . acting angrily and [] use of profanity," Sexton charged Meadows with violation of KRS 189A.010. J.A. at 103.

Meadows claims that he complained that Thomas's handcuffs were too tight, and Trooper Sexton replaced Thomas's handcuffs with her own. Appellant's Br. at 12. Thomas testified that at the time the handcuffs were switched, Meadows made no complaints concerning any pain or injury to the wrist. J.A. at 23. Sexton employed a two-finger spacing method, which is also accepted as a legitimate method of checking for snugness. Appellees' Br. at 7. At this point, Meadows was placed into the back seat of Sexton's cruiser. According to Meadows, when he was placed in the back of Sexton's cruiser, the handcuffs became "very uncomfortable." Appellant's Br. at 12.

At this point, Thomas conducted a custodial search of the passenger compartment of Meadows's truck. No illegal items were recovered. J.A. at 23. During the transport to the Paris Police Department, Meadows complained that the handcuffs were too tight, and Sexton, having earlier ensured that the handcuffs were properly spaced, advised Meadows to stop straining against the handcuffs. Appellees' Br. at 8. There is no evidence that Thomas or Sexton observed any injuries to Meadows's wrists.

After thirty minutes of processing, Meadows was taken to the Bourbon County Hospital for a blood test. According to Meadows, he was in pain from the handcuffs and there was blood on his wrist. At no time, however, did Meadows request medical attention and no physical evidence of the alleged wrist injury was presented. Appellees' Br. at 10-11.

After the blood test was administered, the vile was sealed and Meadows was asked to sign a consent form. Trooper Chris Damon arrived and stated that Thomas wanted Meadows to take a urinalysis test. Sexton retrieved a plastic bottle from the garbage can where she had previously thrown it, and performed a urinalysis. Meadows was transported to the Bourbon County Detention Center and put in the "drunk tank." Meadows was charged with driving under the influence of an intoxicant.

Both test results arrived at the County Attorney's office six months later. The results were negative for both alcohol and drugs. The Honorable Mary Jane Phelps, Bourbon District Court, dismissed the case on September 19, 2001.

## II. DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment *de novo*, using the same standard under Federal Rule of Civil Procedure 56(c) used by the district court. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). We consider the record as it stood before the district court at the time of its ruling. *Niecko v. Emor Mktg.Co.*, 973 F.2d 1296, 1303 (6th Cir. 1992). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence, all facts, and any inferences that may be drawn from the facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Whether an officer is entitled to qualified immunity is a question of law that is reviewed de novo. *Feathers v. City of Akron*, 319 F.3d 843, 847 (6th Cir. 2003).

## B. Qualified Immunity

Qualified immunity is an affirmative defense that shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court in this circuit undertaking a qualified immunity analysis must first determine whether the plaintiff has alleged a violation of a constitutionally protected right; if so, the court must examine whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

The right allegedly violated cannot be asserted at a high level of generality, but, instead, "must have been 'clearly established' in a more particularized, and hence more relevant, sense: the

contours of the right must be sufficiently clear that a reasonable official would understand that what

he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). As the

Supreme Court explained in *Harlow*, the "reasonable person," in this instance, is a "reasonably

competent public official [who] should know the law governing his conduct." *Harlow*, 457 U.S. at

819. The Supreme Court held in *Malley v. Briggs*, 475 U.S. 335 (1986), that an officer sued in a

civil suit will be entitled to immunity if reasonably competent officers could disagree as to the

reasonableness of the defendant officer's response. *Malley*, 475 U.S. at 341. If a reasonably

competent officer would not agree that the behavior was reasonable, however, then the defendant

officer is not entitled to qualified immunity. *Id.* The burden of proving that the rights allegedly

violated were clearly established falls upon the plaintiff, not the defendant. *Dominique v. Telb*, 831

F.2d 673, 676 (6th Cir. 1987). A constitutional right is "clearly established" if the issue has been

determined by the Unites States Supreme Court or the Sixth Circuit. *Ohio Civil Serv. Employees*

*Ass'n v. Seiter*, 858 F.2d 1171, 1177-78 (6th Cir. 1988).

### 1. Thomas's and Sexton's Qualified Immunity on Meadows's Federal and State Law Unlawful Arrest Claims

Meadows claims that there was no probable cause to arrest him for DUI. Under the Fourth

Amendment, the validity of an arrest depends on whether the arresting officer had probable cause

to make that arrest at the time that it was made. *Beck v. Ohio*, 379 U.S. 89 (1964). A "police officer

is permitted to make an arrest if there is probable cause to believe that the arrestee has committed

or is committing an offense." *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997). The probable

cause needed to justify an arrest means that there were sufficient facts and circumstances to warrant

a prudent officer to believe that the suspect had committed or was about to commit an offense. *Beck*,

379 U.S. at 90. The facts known to the officer need not arise to the level necessary for a conviction. Instead, the officer's actions are measured by what a reasonable person would have done under the same circumstances. *United States v. Santana*, 427 U.S. 38 (1976). If a reasonable officer under the same circumstances as the arresting officer would have believed that the arrest was lawful, then the arresting officer is entitled to qualified immunity. *Sandul*, 119 F.3d at 1256.

### a. Thomas

In the instant case, Thomas concluded that Meadows was driving under the influence of an intoxicant other than alcohol based upon : (1) Meadows's alleged illegal passing of vehicles on KY 353; (2) Meadows's alleged running of the stop sign and reckless driving (tail gaiting); (3) Meadows's allegedly red, glossy eyes; (4) Meadows's undisputed trespass onto Thomas's property; (5) Meadows's undisputed verbal confrontation with Thomas and refusal to produce identification for a known law enforcement officer; (6) Meadows's undisputed difficulty in exiting the vehicle; and (7) Meadows's undisputed refusal to participate in field sobriety tests. Appellees' Br. at 5-6.

Based solely upon the above undisputed facts, Meadows's behaviors provided the basis from which Thomas decided to initiate a traffic stop, and ultimately place Meadows under arrest. Again, it is undisputed that Meadows entered upon Thomas's property for the purpose of confronting him. It is undisputed that Meadows refused to produce his identification after Thomas provided identification that showed him to be a KSP trooper. It is undisputed that, after pulling Meadows over, Meadows was unable to promptly produce the requested information, and it is undisputed that he dropped his license upon exiting his vehicle. Finally, it is undisputed that Thomas requested that Meadows perform some form of field sobriety test, which Meadows refused. That Meadows was unable to select his form of sobriety test is of little, if any, import; that Meadows requested a

Breathalyzer test for alcohol-based intoxication, when he was arrested for driving under the influence of an intoxicant other than alcohol, vitiates what import there may have been.

Based upon these undisputed facts, a prudent officer could have concluded that there was sufficient evidence to believe that Meadows had been driving under the influence of an intoxicant other than alcohol. A reasonable officer under the same circumstances as Thomas, therefore, would have believed that the arrest was lawful.

### b. Sexton

Although Thomas initially arrested Meadows, custody was transferred to Sexton (who would be available for court appearances) upon Sexton's arrival. In charging Meadows with DUI, Sexton relied on: (1) the information conveyed to her by Thomas concerning the preceding events; and (2) her own observations of Meadows after her arrival. Her observations included Meadows's "red, glossy eyes," and the belief that he was acting "angrily and did use profanity a couple of times." J.A. at 21.

The law on the transfer of knowledge and information from one police officer to another in effecting arrests is summarized in *Rogers v. Powell*, 120 F.3d 446 (3rd Cir. 1997), which states, in part:

> The legality of a seizure based solely on statements issued by fellow officers who issued the statements possessed the requisite basis to seize the suspect. Moreover, an officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis.

*Rogers v. Powell*, 120 F.3d 446 (3rd Cir. 1997) (citations omitted).

In the present case, Sexton did not rely solely on the information transferred from Thomas. Rather, it was that information in combination with her own observations that served as the basis

for charging Meadows. Sexton, therefore, had probable cause to take custody of Meadows from Thomas and to charge him with DUI. Accordingly, the district court's grant of summary judgment to Thomas and Sexton on the issue of qualified immunity for the alleged unlawful arrest was proper.

### 2. Sexton's Qualified Immunity on Meadows's Federal Malicious Prosecution Claim

In *Thacker v. City of Columbus*, 328 F.3d 244, 258-59 (6th Cir. 2003), this court addressed the uncertain condition of a federal malicious prosecution claim. While this court did not "resolve the elements of a federal malicious prosecution claim," it did determine that "it is clear that a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" *Id*. at 259 (citation omitted). Here, Meadows's arrest and prosecution were justified by probable cause for the reasons stated in the analysis of his unlawful arrest claims. Because he "cannot show the absence of probable cause, [he] cannot demonstrate any seizure in violation of the Fourth Amendment." *Id*. Thus, we need not explore the remaining elements of a malicious prosecution claim here.

### 3. Thomas's Qualified Immunity on Meadows's Claim that He Illegally Searched His Vehicle

The viability of Meadows's claim on the illegal search of his vehicle is dependent upon a finding that the arrest for DUI was unlawful. For the reasons stated above, the arrest for DUI was not unlawful, and, therefore, Meadows's claim against Thomas for searching his vehicle cannot stand. *New York v. Belton*, 453 U.S. 454 (1981) (Incident to a lawful custodial arrest, an officer may search the entire passenger compartment of the arrestee's vehicle and any containers found therein).

### 4. Qualified Immunity on Meadows's Excessive Force Claim

The Supreme Court in *Saucier* noted as follows with regard to the defense of qualified immunity in excessive force cases:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense . . . Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes hazy border between excessive and acceptable force . . . and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

*Saucier*, 533 U.S. at 205-06 (internal citations and quotations omitted).

In this case, Meadows has not alleged that the officers used excessive force in applying the handcuffs to him, and there is no proof that the officers needed to use force to handcuff Meadows. Meadows's claim, therefore, is that the handcuffs were applied too tightly, resulting in injury to his wrist. In *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), this court stated that:

> The tightness of the handcuffs themselves causes greater concern. The right to be free from "excessively forceful handcuffing" is a clearly established right for qualified immunity purposes, *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001), and applying handcuffs [too] tightly [can] certainly raise[] concerns of excessive force. Our precedents allow the plaintiff to get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight. *See Id.*; *Martin v. Heideman*, 106 F.3d 1308, 1310, 1313 (6th Cir. 1997) (reversing directed verdict in favor of defendants on excessive force claim when plaintiff's hands were injured after thirty-five minutes in tight handcuffs).

*Burchett v. Kiefer*, 310 F.3d at 944-45 (6th Cir. 2002).

In *Burchett*, however, the court found that:

> The officers here did not ignore any plea that the handcuffs were too tight. To the contrary, [the plaintiff] complained only once, and on that occasion, [the officer]

> immediately offered to remove the handcuffs if [he] would behave . . . [the officer's] prompt response when [he] finally did complain distinguishes this case from those in which we have found constitutional violations. Until they had notice that the handcuffs were too tight, the officers were unaware of the problem. Once [the plaintiff] gave them notice, they immediately acted. Their actions handcuffing [the plaintiff] did not violate [his] constitutional rights.

*Id.*, at 945.

*Burchett* supports the proposition that a plaintiff establishing a viable Fourth Amendment claim for "excessively forceful handcuffing" must: (1) allege that he complained to the officers that the handcuffs were too tight (or that there is evidence to infer that the officers should have known that the handcuffs were too tight); and (2) as a result of being left in handcuffs that were applied too tightly, he incurs injury to his wrists.

In the instant case, Meadows was handcuffed by Thomas, who employed the accepted method of placing his pinky finger between the handcuffs and the wrist to ensure proper spacing. Meadows claims that he complained that Thomas's handcuffs were too tight, and Trooper Sexton replaced Thomas's handcuffs with her own. Sexton employed a two-finger spacing method, which is also accepted as a legitimate method of checking for snugness. Sexton testified that when she removed Thomas's handcuffs and applied her handcuffs to Meadows, she did not observe any injuries to Meadows's wrist that were consistent with excessively tight handcuffing. J.A. at 35. Moreover, Meadows testified that Sexton's handcuffs were "extremely loose" and that he was more comfortable than he had been while in Thomas's handcuffs. *Id.* According to Meadows, it was only when he was placed in the back of Sexton's cruiser, that the handcuffs "tightened and became very uncomfortable." Appellant's Br. at 12. The cause for the increased tightness, if any, was by implication of Meadows's testimony, Meadows's own movements, or, at most, movement resulting

from the vehicle. While our "precedents allow the plaintiff to get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight," *Burchett*, 310 F.3d at 944-45, they do not compel the conclusion that a plaintiff must get to the jury upon a showing that the handcuffs "tightened and became very uncomfortable" as a result of some action other than the officer's – or, as is likely in this case, a result of the plaintiff's own refusal to stop "straining against the handcuffs." Appellees' Br. at 8.

More importantly, even if the first portion of the analysis were satisfied in the present case, i.e., that the officer applied the handcuffs too tightly and ignored the fact that the handcuffs were too tight, there is no indication in the record (outside of Meadows's own assertion) that the handcuffing resulted in any injuries to Meadows's wrists. Accordingly, summary judgment on Meadows's claim of excessively tight handcuffing is proper based upon the fact that no constitutional violation occurred.

## III. CONCLUSION

Based on the foregoing, the district court's grant of summary judgment for the defendants is **AFFIRMED**.