RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SEAN O'MALLEY,

          *Plaintiff-Appellee,*

    *v.*

CITY OF FLINT,

          *Defendant,*

GARY HAGLER, Acting Police Chief,
          *Defendant-Appellant.*

No. 09-2037

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-11595—Lawrence P. Zatkoff, District Judge.

Argued:  December 10, 2010

Decided and Filed:  July 26, 2011

Before:  GILMAN and GRIFFIN, Circuit Judges; COLLIER, Chief District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Daniel A. Klemptner, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, P.C., Farmington Hills, Michigan, for Appellant. Christopher J. McGrath, Novi, Michigan, for Appellee.  **ON BRIEF:**  Daniel A. Klemptner, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, P.C., Farmington Hills, Michigan, for Appellant. Kenneth M. Scott, Flint, Michigan, for Appellee.

    GRIFFIN, J., delivered the opinion of the court, in which COLLIER, Chief D. J., joined.  GILMAN, J. (pp. 14–23), delivered a separate opinion concurring in part and dissenting in part.

_____

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  Defendant Police Chief Gary Hagler appeals an order of the district court denying his motion for summary judgment based upon qualified immunity regarding plaintiff Sean O'Malley's 42 U.S.C. § 1983 claims of unlawful search and seizure and excessive force.  We reverse and remand for entry of a judgment in favor of defendant Hagler.

I.

The events giving rise to this case began when defendant Gary Hagler, then Acting Chief of Police for the City of Flint, Michigan, was driving an unmarked police vehicle and noticed a blue Chevrolet Tahoe that looked like a Michigan State Police vehicle.  The Tahoe had several features regularly found on Michigan State Police vehicles, which included a large, whip-like antenna mounted on the roof; an emergency vehicle push-bar; "Call 911" decals on its rear quarter panels; red emergency lights in the rear window; a tinted rear window; and the number "47" stenciled in white on the rear tailgate.[1]  Because Hagler suspected that the vehicle was being used to facilitate the impersonation of a law-enforcement officer, he began following the Tahoe.  He also contacted the Michigan State Police to determine whether they had a vehicle in the area that matched its license plate number and description.  He was advised that they did not.

Eventually, the Tahoe was driven into a residential driveway and parked.  After its driver, plaintiff O'Malley, exited the Tahoe and began walking toward the back of the house, Hagler parked his police vehicle in the driveway behind the Tahoe.[2]  Thereafter,

———————————

[1] After the events at issue, Chief Hagler learned that the Tahoe had been a Michigan State Police vehicle before its purchase by plaintiff Sean O'Malley.

[2] The district court characterized the facts as follows:  "Plaintiff, a Caucasian male, stepped out of the vehicle and walked toward the backyard of the residence.  Hagler pulled into the same driveway, notified the MSP desk officer of his location and exited his vehicle."  (Dist. Ct. Opinion & Order, July 10, 2009, at p.2.)

Hagler approached O'Malley, identified himself as a police officer, and said that he would like to speak with him. According to O'Malley, Hagler asked about the vehicle before identifying himself.

O'Malley told Hagler that he was a security guard, had a carrying-concealed-weapon permit, and owned a handgun that was on the front passenger seat of the Tahoe underneath a t-shirt. Thereafter, Hagler asked O'Malley to keep his hands in view and walk toward him. He also requested backup police. When O'Malley approached Hagler, he was angry, raising his voice shouting "this is bulls--t." In response, Hagler handcuffed O'Malley "for safety reasons, and to further investigate whether there were other occupants in the vehicle . . . as well as to verify the validity of his CCW permit, driver's license, proof of insurance, and registration." O'Malley claims that he complained to Hagler that the handcuffs were too tight. However, O'Malley admits that he never asked Hagler to loosen the handcuffs.

Less than two minutes after the handcuffing, additional police officers arrived who assumed custody of O'Malley. Officer Connie Johnson, with the assistance of another police officer, placed O'Malley in the back of her police vehicle, where O'Malley stayed while the officers searched the Tahoe, confirmed its lawful ownership, verified O'Malley's concealed-carry permit, and checked his criminal record with the Law Enforcement Information Network (LEIN). During their search of the Tahoe, the police recovered a loaded .45 caliber, semi-automatic handgun in the location specified by O'Malley. In addition, the LEIN check indicated that a warrant had been issued for O'Malley's arrest by the City of Warren. In view of the arrest warrant, Hagler instructed Johnson to transport O'Malley to the Flint Police Department for pick up by the Warren Police Department. Hagler then left the scene. About two hours later, the Warren Police Department advised Hagler that it had mistaken O'Malley for another individual and that there were no outstanding warrants for O'Malley's arrest. In response, Hagler called Johnson, who was still at the scene, and ordered her to release O'Malley and return his property. O'Malley had been in custody for approximately two hours before his release.

O'Malley alleges that at some point during his custody he asked Officer Johnson to loosen his handcuffs, but she refused to do so. Hagler was unaware of the request.

O'Malley filed suit in the Genesee County Circuit Court against the City of Flint and Chief Hagler, alleging violations of various statutory and constitutional rights. *O'Malley v. City of Flint*, No. 08-11595, 2009 WL 2008480, at *2 (E.D. Mich. July 10, 2009). On defendants' motion, the case was removed to federal district court. *Id.* After remanding the state-law claims, the district court retained jurisdiction over O'Malley's 42 U.S.C. § 1983 claims alleging violations of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. *Id.* The defendants thereafter filed motions for summary judgment. The district court granted the City's motion in its entirety[3] and granted Hagler's motion in part. *Id.* at *4-*7. It determined that Hagler was not entitled to qualified immunity with respect to (1) O'Malley's claim that his Fourth Amendment rights were violated when Chief Hagler stopped, handcuffed and detained him, and caused his Tahoe to be searched; and (2) O'Malley's excessive-force handcuffing claim. *Id.* at *6-*7. Hagler filed a motion for reconsideration, which the district court denied. *O'Malley v. City of Flint*, No. 08-11595, 2009 WL 2413543 (E.D. Mich. Aug. 6 2009). Hagler now timely appeals.

## II.

We have interlocutory jurisdiction over the district court's denial of Hagler's motion for summary judgment on grounds of qualified immunity "to the extent that [the appeal] raises a question of law." *Risbridger v. Connelly*, 275 F.3d 565, 568 (6th Cir. 2002); *see also Johnson v. Jones*, 515 U.S. 304, 319–20 (1995) (holding that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial"). Under 42 U.S.C. § 1983, an individual may bring a private right of action against anyone, who, under color of state law, deprives a person of rights, privileges, or immunities secured by the

---

[3]O'Malley has not appealed the summary judgment in favor of the City.

Constitution or conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). Defendant Hagler contends that he is entitled to summary judgment on plaintiff's § 1983 claims on the basis of qualified immunity. Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). However, if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper. *Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988).

"We review the denial of summary judgment on grounds of qualified immunity *de novo* because application of this doctrine is a question of law." *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Through the use of qualified immunity, the law shields 'government officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). In determining whether a defendant is entitled to qualified immunity, the court makes two inquiries: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]" and (2) was the right "clearly established" to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Although *Saucier* mandated that these questions be addressed in order, that requirement has since been relaxed. *See Pearson*, 129 S. Ct. at 818 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

With regard to the second step,

[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640 (citations omitted); *see Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991) ("In inquiring whether a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'")). "This standard requires the courts to examine the asserted right at a relatively high level of specificity[,]" and "on a fact-specific, case-by-case basis[.]" *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997) (citations and internal quotation marks omitted).

### III.

On appeal, we analyze the claims of qualified immunity in light of the following sequential events: (1) Hagler's parking of his vehicle and initial questioning of O'Malley; (2) Hagler's handcuffing and detention of O'Malley and search of his vehicle; and (3) Hagler's failure to respond to O'Malley's complaint that the handcuffs were too tight.

### A.

The first question is whether Hagler is entitled to qualified immunity with respect to his initial encounter with O'Malley and inquiry. Plaintiff claims that Hagler unreasonably seized him when Hagler parked his police vehicle behind O'Malley's Tahoe. He also alleges that Hagler unlawfully asked him questions. We disagree and hold that Hagler is entitled to qualified immunity for the initial encounter and inquiry.

1.

The Fourth Amendment does not apply to consensual encounters with the police. Rather, the "safeguards of the Fourth Amendment, with respect to police/citizen contact, vest only after a citizen has been seized." *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (citation and internal quotation marks omitted). A seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). We have noted that "[c]ircumstances indicative of a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *Mendenhall*, 446 U.S. at 554). Here, the dissent argues that pursuant to *United States v. See*, 574 F.3d 309 (6th Cir. 2009), and *United States v. Gross*, — F.3d — , 2011 U.S. App. Lexis 12197 (6th Cir. 2011), a reasonable person in O'Malley's position would not have felt free to leave when Hagler parked his vehicle in the driveway. We disagree and note that *See* and *Gross* are readily distinguishable.

*See* and *Gross* dealt with the conduct of a police officer who parked his patrol car in front of (or behind) cars in the parking lots of public-housing complexes in Cleveland, Ohio, and approached passengers who were seated *inside* the vehicles. In *See*, the officer was "on patrol in a public-housing parking lot when he noticed a car that was backed into a parking space in a dimly lit area farther from the building than other vacant spots" and he "pulled his patrol car in front of [defendant] See's car and parked so that See could not move his vehicle." *Gross*, 2011 U.S. App. Lexis 12197, at *11 (citing *See*, 574 F.3d at 311-12). In *Gross*, the officer similarly "parked his police vehicle directly behind" a car parked in "the parking lot of [a] housing complex[]" and "turned on his vehicle spotlights" before approaching the car and asking questions of a man sitting in the car's passenger seat. *Id.* at *2 - *3. In each case, we held that the officer's conduct was a seizure because "the blocking of [the] car to determine the

identity of the occupants and maintain the status quo" would have made a reasonable occupant of the vehicle feel "not . . . free to leave." *Id*. at *11 (citation and internal quotation marks omitted).

The present case is factually different. Most importantly, O'Malley was out of his vehicle and walking toward the house at the time Hagler parked his vehicle behind the Tahoe. Thus, O'Malley not only reasonably thought he was free to leave his vehicle at the time of the alleged seizure, but in fact had left it and was walking away. Also, parking behind a vehicle in a driveway does not inherently send a message of seizure because it is how driveways are routinely used.[4] For these reasons, we conclude that *Gross* and *See* do not control and hold that a reasonable person would feel free to continue walking even after Hagler's vehicle was parked behind the unoccupied Tahoe.

Next, Hagler's approach and accompanying statement to O'Malley that he was a police officer and wanted to talk to him was clearly a consensual encounter. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005). Hagler was not accompanied by the "threatening presence of several officers." *Jones*, 562 F.3d at 772 (citation omitted). He neither displayed a weapon, nor touched O'Malley. *Id.* Moreover, Hagler did not use language or a tone of voice compelling compliance. *Id.* Rather, he merely stated that he was a police officer (which is insufficient to "transform a police-citizen encounter into a seizure requiring some level of objective justification," *United States v. Byrom*, 1992 WL 3711, 952 F.2d 403, *2 (6th Cir. Jan. 10, 1992) (unpublished table decision) (citing *Mendenhall*, 446 U.S. at 555)), and said he wanted to talk to O'Malley about the Tahoe. *Cf. United States v. Matthews*, 278 F.3d 560, 561-62 (6th Cir. 2002) (holding that a person walking down the street was not detained when an officer driving in a marked police car yelled "Hey, buddy, come here," since the statement was a request rather than an order) (internal quotation marks omitted); *United States v. Caicedo*, 85 F.3d 1184, 1191 (6th Cir. 1996) (finding no seizure where, as the car in question moved slowly through an airport parking lot, the officer "asked for

---

[4]Additionally, O'Malley did not argue below or on appeal that his vehicle was blocked in, and he has not offered any evidence that it was. O'Malley failed to submit any evidence regarding the width of the driveway.

permission to speak to either [the driver] or his passenger as [the driver] drove toward the exit, and . . . [the driver] voluntarily stopped the car"). According to O'Malley, Hagler began his conversation by saying, "Hey! Whose truck is that?"

The fact that O'Malley stopped walking to respond to Hagler's inquiry also does not, by itself, transform this encounter into a seizure for purposes of the Fourth Amendment. *See* Wayne R. LaFave, 4 Search & Seizure § 9.4 (4th ed. 2004) (explaining that police may rely on the moral and instinctive pressures of citizens to cooperate and that a confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse) (citations omitted); *cf. generally United States v. Thomas*, 430 F.3d 274, 277, 280 (6th Cir. 2005) (noting that "driveway[s]" provide "ready access to visitors" and are therefore open to consensual encounters between citizens and police) (citation and internal quotation marks omitted). In view of the totality of the circumstances, we hold that defendant O'Malley was not "seized" for purposes of the Fourth Amendment at the time of the initial encounter and questioning.

2.

Alternatively, we hold that had Hagler temporarily seized O'Malley, such a brief investigatory stop was constitutional pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). "To justify a brief, investigatory stop under *Terry v. Ohio*, an officer must point to specific, articulable facts that give rise to a 'reasonable suspicion' that the suspect was engaged in criminal activity." *Gross*, 624 F.3d at 313; *see also Terry*, 392 U.S. at 30 (holding that police officers are permitted to conduct an investigatory stop "where a police officer observes unusual conduct which leads him reasonably to conclude . . . that criminal activity may be afoot"). The reasonableness of a stop is determined by two factors: "'(1) whether there was a proper basis for the stop, . . .'" and, if there was a proper basis for the stop, "'(2) whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand . . . .'" *Smoak*, 460 F.3d at 779 (quoting *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986)). "[T]he greater

the degree of intrusion during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty of wrongdoing." *Smoak*, 460 F.3d at 779.

Here, Hagler had reasonable suspicion to briefly detain O'Malley and inquire about the Tahoe because it appeared to be a Michigan State Police vehicle that could facilitate the impersonation of a police officer. Although O'Malley argues that Hagler had no direct evidence that he was "not only assum[ing] to be [a peace officer] *but* [*also*] *act*[*ing*] *as such. . . .*" in violation of Michigan Compiled Laws § 750.215 (emphasis added), "reasonable suspicion" does not require conclusive evidence. The fact that O'Malley was driving what appeared to be a Michigan State Police vehicle was itself highly "unusual conduct," which led Hagler to draw the reasonable and objective inference that O'Malley may have been impersonating a police officer in violation of state law. *Terry*, 392 U.S. at 30. It is not dispositive that O'Malley was not in fact breaking the law. Moreover, contrary to the dissent's contention, an officer would have *more* justification for believing an individual is impersonating a police officer when the apparent-police vehicle is not registered in the police fleet, as compared to when it is. Pursuant to *Terry v. Ohio*, a brief investigatory stop is justified when the specific facts give rise to "reasonable suspicion" that "criminal activity may be afoot." *Id.* The circumstances of the present case satisfy the *Terry* standard.

For the dual reasons set forth above, we hold that Chief Hagler is entitled to qualified immunity for his initial encounter and inquiry with O'Malley.

### B.

The next issue is whether Hagler is entitled to qualified immunity for the handcuffing and detention of O'Malley and subsequent search of his vehicle. We conclude that he is.

It is not disputed that O'Malley told Hagler that he had a gun in his vehicle, was angry, raised his voice, turned his back and lifted his shirt, and called Hagler's inquiry "bulls--t." Thus, notwithstanding O'Malley's alleged compliance and truthful answers to Hagler's questions, Hagler was faced with a threatening situation. Before him was

an obviously agitated individual in possession of a firearm whom he reasonably suspected of impersonating a police officer.  Chief Hagler was in a one-on-one situation with this unknown, angry individual outside the safe confines of a police station or police cruiser.  Further, because of the tinted windows, Hagler could not see into O'Malley's vehicle to determine just how close the gun was to O'Malley or if there were any passengers.  In view of the circumstances, we conclude that for safety reasons, alone, Hagler was objectively reasonable in briefly handcuffing and detaining O'Malley. *Cf. United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (explaining that "[b]ased on Atchley's nervous behavior and Officer Cobb's past experience, Cobb was justified in handcuffing Atchley as a safety precaution"); *Houston v. Clark Cnty. Sheriff Deputy Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999) (citations omitted) (noting that when an officer fears for his safety, the use of handcuffs does not exceed the bounds of a *Terry* stop, nor does it transform the stop to a formal arrest).

Moreover, pursuant to *Terry*, O'Malley's detention was justified for investigatory purposes for the brief time necessary to verify O'Malley's lawful ownership of the vehicle and confirm the validity of O'Malley's concealed-carry permit.  While at some point during the two-hour stop O'Malley's detention ripened into an arrest, *cf. Florida v. Royer*, 460 U.S. 491, 497-500 (1983); *see also United States v. Sharpe*, 470 U.S. 675 (1985), this occurred after the police learned of and properly detained O'Malley on the arrest warrant issued by the City of Warren.  *See Baker v. McCollan*, 443 U.S. 137, 142 (1979).  For these reasons, we hold that Hagler is also entitled to qualified immunity on O'Malley's Fourth Amendment claims regarding handcuffing, detention, and search.

C.

Finally, we address whether Hagler is entitled to qualified immunity on O'Malley's claim of excessive force regarding his handcuffing.  "The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citation omitted).  However, "[n]ot all allegations of tight handcuffing . . . amount to excessive force." *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005); *see also*

*Meadows v. Thomas*, 117 F. App'x 397 (6th Cir. 2004). "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing." *Morrison*, 583 F.3d at 401 (citation and internal quotation marks omitted). And, even when a plaintiff makes this showing, a defendant officer may still be entitled to summary judgment on the basis of qualified immunity if it would not be clear to a reasonable officer that he was violating the plaintiff's rights. *Id.*; *see also Saucier*, 533 U.S. at 202 (explaining that courts must ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

In the present case, we hold that it would not have been clear to a reasonable officer in Hagler's position that his failure to immediately loosen O'Malley's handcuffs was a constitutional violation. While O'Malley claims that he told Officer Hagler that his handcuffs were too tight, O'Malley did not ask Hagler to loosen the handcuffs. Furthermore, O'Malley did not have an obvious physical injury and was handcuffed for only about two minutes before Officer Johnson arrived and escorted him to her vehicle. At that point, Hagler had no more contact with O'Malley.

Because "[o]ur precedents fail to notify officers that any response to a complaint of tight handcuffing other than an immediate one constitutes excessive force," *Fettes v. Hendershot*, 375 F. App'x 528, 533 (6th Cir. 2010), and because "[i]n the absence of an obvious physical problem caused by the handcuffs or a plea by the defendant to loosen them, it is fair to ask how a reasonable officer should know that a problem has occurred," *Lyons*, 417 F.3d at 576, we hold that Hagler's failure to loosen O'Malley's handcuffs did not violate clearly established federal law. *Cf. Fettes*, 375 F. App'x at 533 (explaining that "a constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight' is neither reasonable nor clearly established").

IV.

For these reasons, we reverse, in part, the order of the district court and remand for the entry of judgment in favor of defendant Hagler.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. The majority has concluded that Officer Hagler is entitled to qualified immunity on all of O'Malley's claims. I agree with the majority that Officer Hagler is entitled to qualified immunity on O'Malley's claim of excessive force. And I also agree that Officer Hagler is entitled to qualified immunity with regard to his initial interaction with O'Malley, but for different reasons than those set forth by the majority. But I disagree with the majority's ruling that Officer Hagler is entitled to qualified immunity as a matter of law for detaining and handcuffing O'Malley. I therefore respectfully dissent on that issue.

#### A. Officer Hagler's initial interaction with O'Malley

The majority concludes that Officer Hagler is entitled to qualified immunity with regard to his initial interaction with O'Malley on the basis that the interaction was a consensual encounter not subject to the protections of the Fourth Amendment. It also concludes that even if Officer Hagler's actions were deemed to constitute a seizure, the seizure would have been a justified investigatory stop.

As set forth below, I would hold that O'Malley was in fact seized when Officer Hagler pulled his police vehicle into the driveway behind O'Malley's Chevrolet Tahoe, and that this seizure was not supported by a reasonable suspicion of criminal wrongdoing that would justify an investigatory stop. Nevertheless, I agree that Officer Hagler is entitled to qualified immunity regarding this interaction because the law was not clearly established that Officer Hagler's actions constituted a seizure at the time the events in this case took place.

### 1. Unreasonable seizure

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  "These safeguards of the Fourth Amendment, with respect to police/citizen contact, vest only after a citizen has been seized." *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (brackets and internal quotation marks omitted).  A seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court created an exception to the general Fourth Amendment requirement that a seizure must be based on probable cause.  The Court held that police officers are permitted to conduct a brief investigatory stop "where a police officer observes unusual conduct which leads him reasonably to conclude . . . that criminal activity may be afoot." *Id.* at 30.  Such a stop is justified based on the lower threshold of reasonable suspicion rather than on probable cause. *Id.*

"To justify a brief, investigatory stop under *Terry v. Ohio*, an officer must point to specific, articulable facts that give rise to a reasonable suspicion that the suspect was engaged in criminal activity." *United States v. Gross*, No. 08-4051 (6th Cir. June 15, 2011), *amending* 624 F.3d 309, 315 (6th Cir. 2010) (internal quotation marks omitted).  An officer must possess a "particularized and objective basis for suspecting the particular person . . . of criminal activity." *Smoak*, 460 F.3d at 778–79 (ellipses and internal quotation marks omitted).  The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted).

A court examines the totality of the circumstances when determining whether reasonable suspicion existed to justify a *Terry* stop. *Smoak*, 460 F.3d at 779.  The reasonableness of a stop is determined by two factors:  "(1) whether there was a proper basis for the stop . . . ; and (2) whether the degree of intrusion into the suspect's personal

security was reasonably related in scope to the situation at hand . . . ." *Id.* (internal quotation marks omitted). "[T]he greater the degree of intrusion during a stop, the more solid must be the officer's suspicion that the stopped individual is guilty of wrongdoing." *Id.*

In *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009), this court held that "the [officer's] blocking of See's car to determine the identity of the occupants and maintain the status quo while obtaining this information was a warrantless *Terry* seizure." *Id.* (internal quotation marks and original brackets omitted). The police officer in *See* "approached and parked his patrol car in front of See's vehicle so that See was unable to drive away." *Id.* at 311. This court reached the same conclusion in *Gross*, 624 F.3d at 315–16, which involved the same police officer as in the *See* case. *Id.* (relying on *See* to hold that the officer conducted a *Terry* stop when he pulled his patrol vehicle directly behind Gross's car, thereby blocking the car in the parking space).

In the present case, Officer Hagler pulled his vehicle into the driveway directly behind O'Malley's Tahoe, preventing O'Malley from exiting the driveway in his vehicle. The record does not clearly reflect whether O'Malley was already out of his vehicle when Officer Hagler pulled into the driveway. But whether O'Malley was still inside the Tahoe or had just exited the Tahoe when Officer Hagler pulled into the driveway makes no legal difference. In either case, O'Malley would have been unable to drive away from the house in his vehicle. Just like the defendants in *See* and *Gross*, who were unable to move their vehicles once the patrol cars had blocked them in, a reasonable person in O'Malley's position would not have felt free to leave while his Tahoe was blocked in the driveway.

The majority disagrees, concluding that

O'Malley not only reasonably thought he was free to leave his vehicle at the time of the alleged seizure, but in fact had left it and was walking away. Also, parking behind a vehicle in a driveway does not inherently send a message of seizure because it is how driveways are routinely used.

(Maj. Op. at 8)  The majority assumes as a fact that O'Malley was outside of his Tahoe when Officer Hagler pulled into the driveway to support its conclusion and distinguish this case from *See* and *Gross*.  But the record does not definitively reflect whether O'Malley was already outside of his Tahoe before Officer Hagler pulled into the driveway.  Moreover, I believe that the proper inquiry is not whether O'Malley felt free to leave his Tahoe, but rather whether he felt free to leave the scene generally.  This court held that the defendants had been seized in both *See* and *Gross* because they were unable to move their vehicles, not because they were physically unable to open their car doors and walk out.  Once Officer Hagler pulled in behind the Tahoe and started questioning O'Malley, a reasonable person in O'Malley's position would no longer have felt free to leave.  He was therefore seized for purposes of the Fourth Amendment.

The majority also states in a footnote that O'Malley has failed to provide any evidence about the "width of the driveway." (Maj. Op. at 8 n.4)  True enough, O'Malley did not testify at his deposition about the driveway's width.  But he did say that Officer Hagler's car was parked about 8 to 10 feet behind his Tahoe, which he elsewhere characterized as "right behind my vehicle."  This provides sufficient evidence to conclude that O'Malley's Tahoe was blocked in by Officer Hagler's vehicle and that O'Malley was not free to leave the scene in his Tahoe. *See Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (noting that one of the questions a court must ask in a qualified-immunity analysis is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right" (internal quotation marks omitted)).

The majority cites *United States v. Thomas*, 430 F.3d 274 (6th Cir. 2005), as additional support for its conclusion that the interaction between O'Malley and Officer Hagler was a consensual encounter.  *Thomas* involved a "knock and talk" encounter at the primary entrance to the house in which Thomas was living.  There, this court concluded that the officers' conduct did not rise to the level of a "constructive entry" into the defendant's residence because "Thomas responded to a simple knock and request, not an order to emerge or [to] the threat of firearms." *Id.* at 278.  In

distinguishing *Thomas* from a case on which Thomas relied, the court noted that "the rear deck [in Thomas's house] was adjacent to the driveway and served as the primary entrance to [the] home. [In the other case], by contrast, the rear deck was not a place such as a driveway, with ready access to visitors." *Id.* at 280 (internal quotation marks omitted).

The majority seizes upon this language as support for its statement that "'driveway[s]' provide 'ready access to visitors' and are therefore open to consensual encounters between citizens and police." (Maj. Op. at 9) But this conclusion does not flow from this court's analysis in *Thomas*. There, the court was discussing why the encounter on the rear deck was consensual (i.e., because the rear deck was near a driveway) and was not analyzing an actual encounter in a driveway, much less a situation of one car blocking another. I therefore question the majority's reliance on *Thomas* to support its conclusion that O'Malley's interaction with Officer Hagler, which occurred in a driveway, was consensual.

Because I would hold that Officer Hagler seized O'Malley, the next step is to determine whether that seizure was based on a reasonable suspicion of criminal activity. Officer Hagler argues that he had reasonable suspicion to stop the Tahoe because it appeared to be a Michigan State Police vehicle that did not have a municipal license plate. He asserts that what he observed while following the Tahoe led him to believe that its driver was unlawfully representing himself as a police officer in violation of Michigan Compiled Laws § 750.215.

Section 750.215 provides that an "individual who is not a peace officer . . . shall not do any of the following: [(1)] [p]erform the duties of a peace officer . . . ; [(2)] [r]epresent to another person that he or she is a peace officer . . . for any unlawful purpose; [and (3)] [r]epresent to another person that he or she is a peace officer . . . with the intent to compel the person to do or refrain from doing any act against his or her will." To violate this provision, a person must do more than falsely assume to be a peace officer. Rather, a person must "not only assume[] to be [a peace officer] but act[] as such, or . . . falsely take[] it upon himself or herself to act or officiate in any office or

place of authority." 3 Gillespie Mich. Crim. L. & Proc. 2d § 78:1; *see also People v. Cronin*, 45 N.W. 479, 480 (Mich. 1890) (interpreting a prior but similar Michigan impersonation statute, holding that "[t]he section does not attempt to punish any person for falsely assuming to be any of the officers named in the section, but for assuming and taking upon himself . . . to act or officiate in any office or place of authority").

Officer Hagler observed O'Malley driving the Tahoe. At no point while he was following O'Malley did Officer Hagler see O'Malley engage in any act that would constitute a violation of § 750.215. He also called the Michigan State Police desk officer to ask whether the Michigan State Police had a vehicle in its fleet that matched his description of the Tahoe. The desk officer responded that the Michigan State Police did not own such a vehicle. Nor did Officer Hagler observe O'Malley commit any traffic violations. So at no time prior to pulling into the driveway behind O'Malley did Officer Hagler have reasonable suspicion to believe the Tahoe's driver was violating the law.

I therefore conclude that Officer Hagler's decision to pull in behind the Tahoe was not a justifiable *Terry* stop. *See Gross*, 624 F.3d at 315 (concluding that the officer did not have reasonable suspicion to conduct a *Terry* stop by using his police vehicle to block the suspect's car in a parking lot where, "at the time [he] parked his police car behind the vehicle in which [Gross] was sitting, [the officer] had already observed that the vehicle was legally parked and, based on the check of an electronic database, knew that there were no outstanding warrants or issues related to the owner of the car").

The majority disagrees. It concludes that "[t]he fact that O'Malley was driving what appeared to be a Michigan State Police vehicle was itself highly 'unusual conduct,' which led Hagler to draw the reasonable and objective inference that O'Malley may have been impersonating a police officer in violation of state law." (Maj. Op. at 10) Although O'Malley's vehicle may have been unusual because it had some of the markings of a Michigan State Police vehicle, Officer Hagler did not witness O'Malley take any actions that would have constituted a violation of § 750.215 or any other laws. Further, any reasonable suspicion that Officer Hagler might have had that O'Malley was impermissibly driving a Michigan State Police vehicle was dispelled after he called the

Michigan State Police desk officer, who informed Officer Hagler that the Michigan State Police did not own a vehicle matching the description given.

In addition, I believe that the majority's analysis would allow a law-enforcement officer to pull over any vehicle similar to O'Malley's based solely on the characteristics of the vehicle alone, without evidence that the driver has violated any Michigan law. This would be an unfortunate result for all those persons who lawfully own and lawfully drive retired Michigan State Police vehicles, particularly in a case like this one where the officer actually knew that the Tahoe was not a Michigan State Police vehicle. I believe that this is precisely why § 750.215 requires more than a showing that a suspect has assumed the identify of a peace officer, but rather that the suspect must have acted as such as well.

### 2. *Clearly established right*

Because I conclude that Officer Hagler's action in pulling into the driveway behind the Tahoe violated O'Malley's constitutional right to be free from unreasonable seizures, I must next determine whether this right was clearly established in the context of this case. Clearly established rights exist where "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (internal quotation marks omitted).

That a *Terry* stop must be based on an officer's reasonable suspicion of criminal activity has long been clearly established. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Williams*, 962 F.2d 1218, 1223 (6th Cir. 1992) (finding that an investigative stop of a vehicle is lawful where the officers have a "reasonable and objective basis for suspecting that [a] particular person is engaged in criminal activity"). Equally well established is the principle that an officer can interact with a citizen through a consensual encounter, "which may be initiated without any objective level of suspicion," *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997), so long as the "person to whom the

questions are put remains free to disregard the questions and walk away," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A consensual encounter, unlike a *Terry* stop, does not constitute a seizure under the Fourth Amendment. *Mendenhall*, 446 U.S. at 554-555.

When the events in question took place in 2006, however, Officer Hagler was not on notice that his initial interaction with O'Malley was an investigatory *Terry* stop rather than a consensual encounter. This court's decision in *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009), was the first time that this circuit clearly stated that when a law-enforcement officer blocks a suspect's car with a police vehicle to "determine the identity of the occupants and maintain the status quo while [he] obtain[s] this information," he is conducting a warrantless *Terry* seizure. *See also Gross*, 624 F.3d at 322 (noting that "it was not until our recent decision in *See* . . . that it would have been clear to Williams that his methods [of blocking in the suspect's car] were decidedly an investigatory stop and not a consensual encounter").

Although the facts in *See* and *Gross* are not identical to the case before us, I believe that they are sufficiently similar to provide notice to Officer Hagler, and to other law-enforcement officers, that they cannot rely on qualified immunity as a defense under the circumstances presented here. But Officer Hagler's initial encounter with O'Malley in 2006 took place prior to this court clearly establishing that blocking a suspect's car constituted a *Terry* stop for which reasonable suspicion is required. I therefore agree with the majority that Officer Hagler is entitled to qualified immunity with regard to his initial interaction with O'Malley, even though the basis for my conclusion is completely different.

**B.  Officer Hagler's detention and handcuffing of O'Malley**

This leads me to the question of whether Officer Hagler is entitled to qualified immunity as a matter of law for his decision to detain and handcuff O'Malley. Unlike the majority, I believe that genuine issues of material fact remain regarding this issue. "In this circuit, it is well established that, for appellate jurisdiction to lie over an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede

to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002). "Once a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial." *Berryman v. Rieger*, 150 F.3d 561, 564–65 (6th Cir. 1998) (dismissing an interlocutory qualified-immunity appeal because the "defendants' appeal attempts to persuade us to believe their version of the facts").

Although Officer Hagler's brief states in a footnote that the underlying facts are undisputed, his recitation of the facts regarding the detention and handcuffing of O'Malley differs in material ways from the facts as alleged by O'Malley. Officer Hagler contends that O'Malley immediately exited the Tahoe and quickly proceeded toward the back door of the residence in question. He also asserts that once O'Malley turned around, he "greeted Officer Hagler with inexplicably aggressive behavior before identifying a firearm nearby." Officer Hagler further claims that he made several attempts to "de-escalate" the situation, but that O'Malley refused to cooperate. In light of the facts as he presents them, Officer Hagler argues that he acted reasonably when he decided to handcuff O'Malley.

In contrast, O'Malley alleges that he truthfully answered all of Officer Hagler's questions and complied with his requests, but was nonetheless placed in handcuffs when he walked over to Officer Hagler. O'Malley also denies that he threatened Officer Hagler in any way, although he acknowledged in his deposition that he was mad at the way he was being treated and had raised his voice to Officer Hagler. The majority cites the fact that O'Malley "turned his back and lifted his shirt" as support for its conclusion that Officer Hagler permissibly handcuffed and detained O'Malley. (Maj. Op. at 10) But O'Malley testified at his deposition that he "turned around to let him know I didn't have anything on me," which hardly supports Officer Hagler's actions.

Given that a genuine dispute remains regarding exactly how the encounter between Officer Hagler and O'Malley unfolded, a reasonable jury could find either (1) that a reasonable officer would have handcuffed O'Malley because the circumstances

warranted that precaution, or (2) that Officer Hagler acted unreasonably given that O'Malley did not pose a threat under the circumstances. *See Dorsey v. Barber*, 517 F.3d 389, 399–400 (6th Cir. 2008) (holding that the reasonableness of the force used must be evaluated from the perspective of a reasonable officer at the scene, which requires careful attention to the facts of the particular case, including "(1) the severity of the crime at issue, (2) the immediacy of the threat posed by the suspect to the officers or others, and (3) whether the suspect is actively resisting arrest") (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

And because Officer Hagler "challenges the quantity and quality of [O'Malley's] evidence . . . [,] the narrow boundaries of [this court's] jurisdiction prevent us from proceeding any further." *See Berryman*, 150 F.3d at 564. This portion of Officer Hagler's appeal "boils down to credibility determinations [that this court] cannot make." *See id.* I therefore conclude that a jury, and not this court, should determine whether Officer Hagler's actions were reasonable under the circumstances, or whether they constituted a violation of O'Malley's Fourth Amendment rights. For this reason, I respectfully dissent on this issue.