NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0260n.06

No. 08-4419

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Apr 28, 2010**
LEONARD GREEN, Clerk

ROBERT FETTES,

     Plaintiff-Appellee,

v.

ADAM HENDERSHOT, <u>et al.</u>,

     Defendants,

and

DAN MILBURN, Individually and in his Official
Capacity; MARK DELANCY, Individually and
in his Official Capacity; DAVID SCHICK,
Individually and in his Official Capacity,

     Defendants-Appellants.

                                  /

On appeal from the United States
District Court for the Southern
District of Ohio

BEFORE:    RYAN, COOK, and WHITE, Circuit Judges.

     RYAN, Circuit Judge.     The plaintiff, Robert Fettes, brought a 42 U.S.C. § 1983 claim against numerous municipalities, dispatchers, police officers, and jail personnel alleging that his Fourth and Fourteenth Amendment rights were violated during an unlawful arrest that included the use of excessive force. The district court granted in part and denied in part the defendants' motion for summary judgment, and particular to this appeal, denied officers Dan Milburn and Mark Delancy, and dispatcher David Schick's motion for summary judgment on the basis of qualified immunity.

Milburn, Delancy, and Schick now appeal and we reverse the portion of the district court's judgment that denied them qualified immunity.

## I.

In the late 1990s, Fettes owned a company named RDF Developments, Inc., which operated several pizza shops, including one called Plus One Pizza, in Cambridge, Ohio. Sometime in 1998, RDF filed for bankruptcy protection. Fettes's son, Robert Fettes, Jr., along with Fettes's wife, Nancy, purchased the assets of RDF, formed Kelco Pizza, Inc., and continued to operate the pizza shops, including the Plus One Pizza shop in Cambridge.

Sometime in 2004, Special Agent Scott Bunting from the Ohio Bureau of Workers' Compensation (BWC) began investigating Plus One Pizza for its alleged failure to pay the premiums for workers' compensation coverage. Bunting filled out a "72 hour letter" for Plus One Pizza to inform the owner, Kelco Pizza, Inc., that it had 72 hours to make current its unpaid premiums, or the BWC would take out a private complaint/warrant against it.

The BWC uses a computer database called WCIS, which stores employer-provided information. The BWC's records list the president of Kelco Pizza as "Robert D. Fettes, Jr." and the owner as "Nancy L. Fettes." Bunting's personal report indicates that the contact for Kelco Pizza was simply a "Robert Fettes." The address shown on the report for Kelco Pizza was Robert Fettes, Jr.'s, home address.

On March 25, 2004, Bunting went to the address listed in the BWC records for Kelco Pizza to deliver the 72 hour letter. According to Bunting, Robert Fettes, Jr., answered the door. When Bunting asked to speak to the owner of Kelco Pizza, Robert Fettes, Jr.,

indicated that the owner was his father. Robert Fettes, Jr., signed the acknowledgment that he had received the 72 hour letter.

Seven months later, after confirming that the premiums were still unpaid, Bunting initiated a criminal complaint, also known as a private warrant. The arrest warrant lists "Robert Fettes" as the defendant, with Robert Fettes, Jr.'s, home address. Bunting later testified that, at the time, he did not know there were two Robert D. Fetteses, a junior and a senior. The Cambridge municipal court deputy clerk signed and issued the warrant. No magistrate reviews these private warrants.

On May 6, 2005, Caldwell Police Officer Adam Hendershot watched Fettes Sr.'s car run a stop sign and ordered Fettes, the driver, to pull over. Fettes was returning from Plus One Pizza, having just picked up his son Michael Fettes, who was working there. Hendershot called Noble County dispatcher Ryan Starr and asked for a routine warrant check on Fettes. Hendershot provided Starr with two social security numbers. Both came back with "hits," or active warrant notifications, on the LEADS electronic database: one for a Michael Fettes, and one for a Robert Fettes, both originating in Cambridge.

Starr then called the Cambridge Police Department and verified the existence of the warrants. We note, in passing, that even though Starr testified that he found both warrants by checking LEADS, during the course of litigation the parties stipulated that the BWC warrant was not in LEADS, but only on a paper copy in the Cambridge office.

Based on Starr's information, Hendershot arrested both Fettes and his son Michael. Fettes later testified that he immediately told Hendershot that there must be some mistake. To verify that he had the right man, Hendershot telephoned Cambridge dispatcher David Schick and provided him with Fettes's social security number. Schick testified that he had

very little memory of the phone call, but that he "think[s]" he verified the warrants, pulled the BWC warrant, and wrote a social security number on the back of one of them. He also testified that it is not uncommon for private warrants to contain only a name and address. When possible, another database, CAD, is used to try to further identify or cross-check the identity of persons named in arrest warrants.

Once Schick confirmed the existence of the warrants, Hendershot handcuffed Fettes and his son Michael and drove them to Cambridge where he turned them over to officers Milburn and Delancy. At the exchange, Hendershot removed his sets of handcuffs from the two men, and Milburn then applied his own set of handcuffs to Fettes, Sr. Fettes testified that he immediately complained that his handcuffs were too tight.

Milburn and Delancy then drove the men approximately 10 minutes to the Guernsey County jail. Fettes testified that, upon arrival, he was presented with a copy of a warrant with his son Robert Fettes, Jr.'s, social security number handwritten on it. Fettes also testified that he asked jail officer Jackie Young to remove his handcuffs because they were hurting him. She removed his cuffs after searching him.

Fettes then informed jail officer Ron Fitch that the warrant was not for him. Fitch compared the social security number written on the warrant to Fettes's driver's license, which contained Fettes's social security number, and noted the mistake. Fettes was then released. The entire episode lasted about two hours.

Fettes testified that after being released, he went to a hospital emergency room. Fettes now claims to suffer from "handcuff neuropathy," a permanent damaging of the nerves in his wrists.

Fettes filed a § 1983 suit against almost everyone involved in the incident, claiming his Fourth and Fourteenth Amendment rights were violated by an unlawful arrest, and that Milburn and Delancy used excessive force against him by applying the handcuffs too tightly. The defendants jointly filed a motion for summary judgment.

The district court granted summary judgment in favor of Hendershot and the Village of Caldwell on all counts except the claim that Hendershot made an unconstitutional traffic stop; granted summary judgment in favor of dispatcher Starr and Noble County; granted summary judgment in favor of various corrections officers, Todd Knauf, Eric Miller, and Jackie Young, and Guernsey County; and denied summary judgment to officers Milburn and Delancy, dispatcher Schick, and the City of Cambridge on all claims except the state law claims. The parties stipulated to the dismissal of the remaining claim against Hendershot. Milburn, Delancy, and Schick filed this interlocutory appeal, claiming that the district court erred in denying them summary judgment on the grounds of qualified immunity.

## II.

We review a district court's denial of summary judgment on grounds of qualified immunity de novo. McCloud v. Testa, 97 F.3d 1536, 1541 (6th Cir. 1996).

## A.

The doctrine of qualified immunity "is an immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis in original). It is "an entitlement not to stand trial or face the other burdens of litigation." Id. Qualified immunity shields government officials from civil liability in the performance of discretionary

functions so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Generally, qualified immunity "applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful."  Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009).  Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal quotation marks and citation omitted).

To determine whether qualified immunity was properly denied, this court examines: (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though not necessarily in that order.  Pearson v. Callahan, 129 S. Ct. 808, 815-16, 818 (2009).  The "clearly established" question looks at "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001), receded from on other grounds, Pearson, 129 S. Ct. 808.

The Supreme Court has emphasized that the "driving force" behind the creation of the qualified immunity doctrine was a desire to ensure "that insubstantial claims against government officials [will] be resolved prior to discovery."  Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987) (internal quotation marks and citation omitted).  Despite the Supreme Court's instruction to raise the qualified immunity issue "at the earliest possible stage in litigation," Hunter, 502 U.S. at 227, many parties wait until the summary judgment stage to raise the issue.  It is not clear to us why a government official would submit himself to

depositions and other discovery methods, rather than assert his entitlement to qualified immunity immediately after being served with a § 1983 complaint.

But even at the late stage of summary judgment, the qualified immunity analysis remains a question of law for a judge to decide. In an interlocutory challenge to a qualified immunity decision in a summary judgment motion, "the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." Berryman v. Rieger, 150 F.3d 561, 562 (6th Cir. 1998). We do not have jurisdiction to entertain interlocutory qualified immunity appeals based on questions of fact. Id. Whether there is a genuine issue of material fact is immaterial to a qualified immunity analysis because the court assumes the facts are as the plaintiff alleges.

All that remains is the question of law whether, taking the facts as plaintiff alleges them, the plaintiff's clearly established constitutional rights were violated.

**B.**

Fettes claims that Schick violated Fettes's Fourth Amendment constitutional protection against unlawful arrest.

Under the Fourth Amendment, the validity of an arrest warrant depends, inter alia, upon its issuance being supported by probable cause. Baker v. McCollan, 443 U.S. 137, 142-43 (1979). Arrest warrants in the hands of a police officer, unless facially invalid, are presumed valid. The Supreme Court has held that if, in executing a presumptively valid arrest warrant, the police reasonably mistake a second person as being the individual named in the warrant and arrest him, the arrest of the second person does not offend the Constitution. Hill v. California, 401 U.S. 797, 802 (1971).

In <u>Masters v. Crouch</u>, 872 F.2d 1248 (6th Cir. 1989), this court held that "police and correction employees may rely on facially valid arrest warrants even in the face of vehement claims of innocence by reason of mistaken identity or otherwise." <u>Id.</u> at 1253 (citing <u>Baker</u>, 443 U.S. at 145).

The arrest warrant intended for Robert Fettes, Jr., was issued for a generic "Robert Fettes" and, despite the senior Fettes's protests, police arrested and held him for about two hours before the mistake was cleared up. Fettes does not argue that the BWC warrant was invalid. He argues only that Schick should have done a better job verifying that the warrant was intended, not for him, but for Robert Fettes, Jr. While the district court determined that Schick "knew that private-complaint warrants were unreliable," an officer does not violate the Constitution by relying on a facially valid warrant. <u>Baker</u>, 443 U.S. at 143.

More importantly, Schick did not arrest Fettes. He only verified on the telephone the existence of a warrant for a "Robert Fettes." It may be argued that Schick was negligent in failing to verify Fettes's address, as that information was readily verifiable, but negligence does not equate to a constitutional violation.

Fettes alleges almost the same thing the claimant in <u>Baker</u> alleged, that the police officer failed to investigate and determine that the wrong man had been arrested. The <u>Baker</u> Court specifically instructed that tort analyses were inapplicable to these types of claims because, while a mistaken identity arrest may rise to the level of a tort claim, it is simply not enough for a constitutional violation. <u>See</u> <u>id.</u> at 142.

**C.**

Fettes's claim against Milburn and Delancy is that they violated Fettes's Fourth Amendment constitutional protection against excessive force when they arrested him.

"The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure." Morrison v. Bd. of Trs. of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009). Not all allegations of tight handcuffing, however, amount to excessive force. "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." Id. (citation omitted).

Accepting Fettes's version of the facts as true, after Milburn handcuffed him, Fettes complained that the handcuffs "were much too tight and that they were hurting [him]." In response, one of the officers asked if Fettes had a medical problem. Fettes answered that he was 64 years old and had bad knees. According to Fettes, the officer responded: "'Don't worry about it. We have a 10-minute drive.'" Fettes also testified that he "had leaned back on [the handcuffs], and appeared they [sic] to be tightening and hurt worse as [he] leaned back on them." Fettes further testified that he told the officer "several times" that the handcuffs were hurting and each time the officer responded: "'Well, you don't have long, Bub. We only have a 10-minute drive.'" When Fettes arrived at the station, a jail officer searched him and then removed his handcuffs. Fettes now claims injury.

Even assuming Fettes properly alleged facts supporting an excessive force violation, such a right was not "clearly established." While a generalized right to be free from unduly tight handcuffing is "clearly established," Martin v. Heideman, 106 F.3d 1308, 1313 (6th Cir.

1997), the Supreme Court counsels us to undertake a more particularized inquiry, asking "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

After careful consideration of the record and our precedent, we answer this question in the negative. To deny the officers qualified immunity, we must deem their use of force under the circumstances objectively unreasonable. Chappell, 585 F.3d at 907. We find the opposite: a reasonable officer would not know that the failure to respond to a complaint about tight handcuffs during a ten-minute ride to the police station violates the Constitution.

Our precedents fail to notify officers that any response to a complaint of tight handcuffing other than an immediate one constitutes excessive force. Indeed, a constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are "too tight" is neither reasonable nor clearly established. Here, the short duration of the trip, adherence to police handcuff protocol, and absence of any egregious, abusive, or malicious conduct supports the reasonableness of the officers' conduct. Moreover, unlike other cases in which we have denied qualified immunity, the officers here acted without malice and with reason—they declined to loosen the handcuffs in light of the short, ten-minute transport to the police station. Cf. Morrison, 583 F.3d at 402-03; Baskin v. Smith, 50 F. App'x 731, 737-38 (6th Cir. 2002); Kostrzewa v. Troy, 247 F.3d 633, 640 (6th Cir. 2001); Martin, 106 F.3d at 1310.

At the very worst, the decision not to pull over the vehicle and readjust Fettes's handcuffs during the ten-minute trip to the station falls in the "hazy border between

excessive and acceptable force" along which qualified immunity operates to shield officers from discretionary, on-the-spot judgments. The district court should have granted qualified immunity to Milburn and Delancy.

**III.**

We conclude that the district court erred when it denied Milburn, Delancy, and Schick's motion for summary judgment on the grounds of qualified immunity. We therefore **REVERSE** the district court's judgment as to Milburn, Delancy, and Schick, and **REMAND** the case for further proceedings.

**HELENE N. WHITE, Circuit Judge** (concurring and dissenting).  I join the majority in concluding that the district court erred in denying Dispatcher Schick's motion for summary judgment based on qualified immunity.  However, I respectfully dissent from Part II.C and the related portion of Part III of the majority's opinion.

As the majority notes, because this is an interlocutory appeal of a denial of qualified immunity, we must accept the facts as alleged by Fettes and interpret those facts in the light most favorable to him.  *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998).  I find no error in the district court's determination that Fettes established genuine issues of fact as to whether the cuffs were unduly tight, he complained of their tightness, the officers ignored his complaints, and he sustained physical injury as a result.  This court observed in *Burchett v. Kiefer,* 310 F.3d 937 (6th Cir. 2002), that "[o]ur precedents allow the plaintiff to get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight."  *Id.* at 944 (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001); *Martin v. Heideman*, 106 F.3d 1308, 1310, 1313 (6th Cir.1997)).  Thus, I find no error in the district court's analysis up to this point.

This statement from *Burchett,* echoed in *Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005), must be reconciled with the two-pronged inquiry announced in *Saucier v. Katz,* 533 U.S. 194 (2001), refined in *Brosseau v. Haugen,* 543 U.S. 194 (2004), and modified in *Pearson v. Callahan,* __ U.S. __, 129 S. Ct. 808 (2009), which requires a court to determine whether "the facts alleged show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201, and also "whether the right was clearly established . . . in

light of the specific context of the case, not as a broad general proposition . . . ." *Id.*[1]  I read

_____

[1]*Saucier* set forth the two-pronged test:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry.  *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991).  In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established . . . .

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

> In this litigation, for instance, there is no doubt that *Graham v. Connor*, [490 U.S. 386 (1989)], clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.  Yet that is not enough.  Rather, we emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  483 U.S., at 640, 107 S. Ct. 3034.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  See *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("[A]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

*Saucier,* 533 U.S. at 201-02.

*Brosseau* emphasized that the right must be clearly established in a particularized sense as relevant to the situation faced by the officer which, in *Brosseau,* was "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."  543 U.S. at 200.

*Burchette* as addressing the same inquiry as the Supreme Court cases—whether an officer is entitled to qualified immunity as a matter of law. I further read *Burchette* as stating that this court has recognized that "[t]he right to be free from 'excessively forceful handcuffing' is a clearly established right for qualified immunity purposes," and that a plaintiff can establish an excessive-force handcuffing claim by showing that the handcuffs were applied excessively and unnecessarily tightly, the plaintiff complained, and the pleas were ignored. *Burchette,* 310 F.3d at 944-45. *Lyons* and other cases add an injury requirement. Implicit in *Burchette*'s use of the terms "excessively" and "unnecessarily" is the concept of unreasonableness, which is the constitutional yardstick. In other words, within these descriptive terms is the requirement that the officer's use of force be shown to have been objectively unreasonable under the circumstances presented, and if this showing is made, the first prong of the *Saucier* test, whether there has been a constitutional violation, has been met.

In ruling on a motion seeking qualified immunity in an excessive-force-handcuffing case, the district court must go beyond the question whether the facts are adequate to support a claim that excessively (unreasonably) tight handcuffs, of which the plaintiff complained to no avail, caused injury. The court must further inquire whether the right was clearly established, i.e., "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Saucier*, 533 U.S. at 199; *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir. 2004). The majority concludes that

---

*Pearson* retreated from *Saucier*'s requirement that the two questions be addressed sequentially, and expressly allows lower courts to exercise their discretion in deciding which of the two prongs should be addressed first. 129 S. Ct. at 818.

as a matter of law it would not be clear to a reasonable officer that Fettes's constitutional rights were being violated and is concerned that "a constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight'" is not reasonable. However, taking the facts in the light most favorable to Fettes, a finding that there was a clearly established right does not lead to such a requirement. The Constitution prohibits the use of unreasonable force in effecting a seizure, which has been consistently interpreted as including a prohibition on the unreasonable use of excessively tight handcuffs. It is not disputed that Fettes was compliant, was arrested for an administrative violation, and posed no threat. Further, the allegation is that the handcuffs were too tight when they were first applied, and that Fettes complained at that time and again during the ride, but Milburn refused to act at any time. As the district court observed, Fettes's allegations are in this respect distinguishable from those in *Meadows v. Thomas*, 117 F. App'x 397 (6th Cir. 2004), where the handcuffs were not excessively tight when applied but became so through the plaintiff's movements and conduct. The Constitution may not require that an officer stop and investigate each and every utterance of discomfort made by an arrestee complaining that his handcuffs are too tight, but this Court has held again and again that it does require that an officer not apply handcuffs unreasonably and excessively tightly, and in furtherance of that requirement, that the officer respond reasonably to a complaint that the handcuffs have been applied excessively tightly.

I conclude that the district court did not err. A reasonable officer in Officer Milburn's position would have known that an arrestee has a right not to be handcuffed in an unreasonable manner, and that a complaint that handcuffs are too tight requires at least

an inquiry whether the handcuffs are, in fact, unreasonably tight.  Viewing the allegations in a light most favorable to Fettes, a reasonable officer in Milburn's position would not have concluded that he had legitimate justification under the law for acting as he did.  *Saucier,* 533 U. S. at 208.