NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0602n.06

**Case No. 14-3910**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Aug 26, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MUHAMMAD AL-LAMADANI, | ) | |
| | ) | |
| *Plaintiff-Appellee,* | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| KEITH LANG; VILLAGE OF INDIAN HILL, | ) | DISTRICT OF OHIO |
| | ) | |
| *Defendants-Appellants.* | ) | |
| | ) | |
| | ) | O P I N I O N |

BEFORE:     COLE, Chief Judge; MERRITT and BATCHELDER, Circuit Judges.

COLE, Chief Judge. After Ruby al-Lamadani called 911 to report that her husband was in their home in violation of a protection order, two officers from the Indian Hill Rangers arrived at the al-Lamadani house. After speaking with Mrs. al-Lamadani, they detained and handcuffed plaintiff-appellee Muhammad al-Lamadani, her husband, in the living room for fifteen minutes. One of the officers called the county clerk's office, which could find no record of any protection order, so the officers released Mr. al-Lamadani from the handcuffs.

Mr. al-Lamadani brought excessive-force and unlawful-seizure claims under 42 U.S.C. § 1983 against defendant-appellant Keith Lang, the officer who handcuffed him, and the Village of Indian Hill. The district court denied qualified immunity to Officer Lang because there was evidence in the record that Officer Lang knew that Mr. al-Lamadani had not yet been served with

the protection order and therefore he lacked probable cause to seize Mr. al-Lamadani. The district court also held that Mr. al-Lamadani had established a factual dispute about whether Officer Lang used excessive force in handcuffing Mr. al-Lamadani. Finally, the district court denied the village's motion for summary judgment on the municipal-liability claim, finding a genuine issue of material fact about whether the village had failed to train its officers on the detention of suspects in domestic-violence matters and the excessively-forceful use of handcuffs.

We affirm the denial of qualified immunity and dismiss the appeal of the municipal-liability claim for lack of jurisdiction.

## I. BACKGROUND

On May 25, 2011, Indian Hill Rangers Keith Lang and Ray Manning responded to a 911 call from Ruby al-Lamadani. The call was precipitated by the arrival of her husband of more than thirty years, Muhammad al-Lamadani. Mr. al-Lamadani had been traveling abroad for his job as an executive at General Electric and had not been able to reach his wife for two weeks. After flying from London to Cincinnati and driving to the al-Lamadanis' home in Indian Hill, Mr. al-Lamadani attempted to unlock the front door, but his keys failed to open it. He then entered the house through the unlatched back door and found his wife sleeping on the couch. After he woke her up, she asked him what he was doing there and then told him to leave the house. He refused. She then called the police while he sat in the living room. She did not tell him that she had filed a protection order against him or filed for divorce while he was gone.

On the 911 call, which Mr. al-Lamadani later testified was inaudible to him, Mrs. al-Lamadani told the dispatcher that her husband was in the home in violation of a protection order, and that he was threatening her but had not been violent. In response to the dispatcher's question, she said she did not know if her husband was armed. The dispatcher relayed to

Officers Lang and Manning that Mr. al-Lamadani was in the house in violation of a protection order, that there was "not a lot of activity" at the residence, and that the "husband [was] just watching the wife's actions right now." 911 call, R. 25-1, Track 3. He also said it was unknown whether Mr. al-Lamadani was armed and that both the al-Lamadanis were in the living room of the house. The dispatcher remained on the phone with Mrs. al-Lamadani until Officer Lang knocked at the door.

Officer Lang arrived at the al-Lamadani residence approximately two minutes after the 911 call. Officer Lang later testified that at the start of his shift that night, he had seen a newly docketed protection order, which stated that Mr. al-Lamadani was prohibited from entering the house without the advance invitation of his wife. The Indian Hill Rangers had a policy before each shift to place such protection orders in follow-up files for the officers who would be on patrol so that they would be aware of the orders in case of calls regarding violations of them.

When Officer Lang arrived at the residence, Mrs. al-Lamadani met him at the front door and told him that she had been asleep on the couch and was awakened by her husband, who was standing over her. She told Officer Lang that she had changed the locks on the house but had accidentally left the back door unlatched, which allowed Mr. al-Lamadani to enter. Officer Lang testified that she seemed very upset and afraid of her husband. Mrs. al-Lamadani also informed Officer Lang that her husband had not been inside the residence since October 2010,[1] that he had been violent with her in the past, and that she did not know if he had any weapons. She confirmed that he had not been violent that evening. She also told Officer Lang that she had not expected Mr. al-Lamadani to be in the house because she thought he was in London. While he

---

[1] Mr. al-Lamadani testified that he was last inside the Indian Hill house in February 2011, but there is no evidence that he told this to Officer Lang. Mr. al-Lamadani also testified that although he and Mrs. al-Lamadani jointly owned their home in Indian Hill, his primary residence at the time of the incident was in London, where he worked.

was speaking with Mrs. al-Lamadani, Officer Lang could see through the window that her husband was seated in a chair in the living room, staring straight ahead, which Officer Lang testified he considered "strange behavior." Lang Dep., R. 25, PageID 124. Mrs. al-Lamadani also told Officer Lang that she did not know if Mr. al-Lamadani was served with the protection order and that it was filed just that morning.

A few minutes later, Officer Manning arrived at the residence and Officer Lang entered the house with Mrs. al-Lamadani's consent. Officer Lang walked into the living room, ordered Mr. al-Lamadani to stand, and handcuffed him. Officer Lang testified that Mr. al-Lamadani raised his voice and was "pretty vocal" in demanding to know why the officers were in his home. Lang Dep., R. 25, PageID 127. Mr. al-Lamadani testified that Officer Lang told him to shut up after he asked: "What did I do? It's my home." Al-Lamadani Dep., R. 22, PageID 77. As Officer Lang was handcuffing Mr. al-Lamadani, he commented that Mr. al-Lamadani's hands seemed stiff. According to Mr. al-Lamadani, in response to further questions about why the officer was handcuffing him, Officer Lang told him to shut up and said, "You people don't hear. You people don't understand." *Id.* at 85. After applying the handcuffs, Officer Lang patted down Mr. al-Lamadani to check for weapons and also asked him if he had a gun, to which Mr. Al-Lamadani responded emphatically that he had never owned or used a gun. Officer Lang directed Mr. al-Lamadani to sit down in a chair in the living room, and he complied.

After he was handcuffed, Mr. al-Lamadani complained that the handcuffs hurt him. Officer Lang responded that "handcuffs always hurt." Lang Dep., R. 25, PageID 130. Officer Lang testified that he did not loosen the handcuffs, although he could not remember whether he had checked them to make sure they were not too tight or whether he simply told Mr. al-

Lamadani that he did not think they were too tight. According to Mr. al-Lamadani, the cuffs left a red mark on his wrist that turned blue and then disappeared the next day.

While Mr. al-Lamadani was seated, handcuffed, on the chair in his living room, Officer Manning entered the residence and told him that Mrs. al-Lamadani had a protection order against him. Mr. al-Lamadani responded that he had just returned from London and was unaware of any restraining order. After Officer Manning showed him a copy of the order that Mrs. al-Lamadani had given to the officers, Mr. al-Lamadani said that he had never seen it. Officer Manning called the Hamilton County Clerk of Courts and discovered that the order had not been served on Mr. al-Lamadani. The officers then removed the handcuffs, told Mr. al-Lamadani to leave the house, and followed him outside to his car. The parties agree that the period of detention during which Mr. al-Lamadani was handcuffed was approximately fifteen minutes.

Both officers testified that they were unaware whether the Rangers had a policy to handcuff a person who was suspected of violating a protection order. They testified that they had undergone no specific training for this type of situation but were aware of the department's use-of-force continuum, which included consideration of when to use handcuffs on a suspect. Officer Frank Cogliano, who filed the case report for the protection order on the afternoon preceding the incident at the al-Lamadani house, testified that officers decide based on the circumstances whether to handcuff a suspect in his home.

Mr. al-Lamadani filed claims under 42 U.S.C. § 1983 for excessive force and unlawful seizure, as well as an unlawful search, in the United States District Court for the Southern District of Ohio against Officer Lang, in his individual capacity, and the Village of Indian Hill. The district court granted the defendants' motion for summary judgment on Mr. al-Lamadani's unlawful search claim, which Mr. al-Lamadani had abandoned, but denied the motion for

summary judgment on the excessive-force and unlawful-seizure claims. The district court concluded that Lang was not entitled to qualified immunity, because a reasonable trier of fact could find that Officer Lang violated Mr. al-Lamadani's clearly established constitutional right not to be arrested without probable cause or subjected to excessively forceful handcuffing. As support for its decision, the district court noted that Mr. al-Lamadani was seated quietly in the living room, the 911 operator had told Officer Lang that there was "not a lot of activity going on" at the residence, and Officer Lang had testified that he believed he had seen the just-docketed civil protection order prior to the beginning of his shift that evening, and thus would have known that Mr. al-Lamadani had not yet been served with the order because he was traveling and had just arrived at his home late that evening. The district court also denied the village's motion for summary judgment, finding a dispute of material fact about whether the municipality failed to train its officers not to violate the Fourth Amendment rights of individuals by detaining them in their homes and using excessive force when handcuffing them.

The defendants timely appealed the denial of qualified immunity to Officer Lang and the denial of the motion for summary judgment on the failure-to-train claim against Indian Hill.

## I. ANALYSIS

### A. Standard of Review

We have jurisdiction over an interlocutory appeal of the denial of qualified immunity only "to the extent that the appeal raises a question of law." *O'Malley v. City of Flint*, 652 F.3d 662, 666 (6th Cir. 2011) (citation and alteration omitted). We generally may not review a district court's determination that the record on summary judgment contains a genuine dispute of material fact unless that determination is "blatantly and demonstrably false." *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009). In other words, "a determination that a given set

of facts violates clearly established law is reviewable, while a determination that an issue of fact is 'genuine' is unreviewable." *See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007). If an appeal "make[s] some factual arguments" but "also presents . . . discrete legal question[s]," we exercise jurisdiction over the legal questions but not the factual disputes. *Marvin v. City of Taylor*, 509 F.3d 234, 237 (6th Cir. 2007). "As a purely legal determination, the district court's denial of qualified immunity is subject to *de novo* review." *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (citation omitted). To the extent that there is disagreement about the facts, we review all evidence in the light most favorable to the plaintiff. *Id.*

We review the denial of summary judgment on the basis of qualified immunity de novo. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all facts and the inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Martin*, 712 F.3d at 957.

### B. Qualified Immunity

The qualified-immunity doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In considering a claim for qualified immunity, we conduct a two-step inquiry. *Id.* at 232. First, we must decide whether the facts viewed in the light most favorable to the plaintiff show that the officer has violated the plaintiff's constitutional right. *Id.* Second, we determine whether the right in question was

clearly established at the time of the violation. *Id.* "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (internal quotation marks, citation, and alterations omitted). We may consider the two steps of the inquiry in either order. *Pearson*, 555 U.S. at 242. The plaintiff bears the burden to show that a defendant is not entitled to qualified immunity. *O'Malley*, 652 F.3d at 667.

In deciding whether the right was clearly established, the Supreme Court has cautioned lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *O'Malley*, 652 F.3d at 667 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### 1. Seizure

The Fourth Amendment protects against unreasonable seizures, "including seizures that involve only a brief detention short of traditional arrest." *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (quoting *Davis v. Mississippi*, 394 U.S. 721 (1969)). Generally, seizures are reasonable only if based on probable cause to believe that the individual has committed a crime. *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013). In determining whether an officer had probable cause to detain a suspect, we consider whether "the facts and circumstances within the officers' knowledge [are] sufficient to warrant a man of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). "The facts and circumstances examined are confined to those within an officer's knowledge at the time of an arrest." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 362 (6th Cir.

2013) (internal quotation marks and citation omitted). "Where the police have sufficient inculpatory evidence to give rise to a determination of probable cause and they do not know of any exculpatory evidence," the failure to investigate further does not negate probable cause. *Klein v. Long*, 275 F.3d 544, 552 (6th Cir. 2001). However, an officer must take into account all *known* exculpatory evidence when making a probable-cause determination. *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).

Under Ohio law, a person who "[k]nowingly enter[s] or remain[s] on the land or premises of another," without privilege to do so, is guilty of criminal trespass. Ohio Rev. Code Ann. § 2911.21. The Supreme Court of Ohio has held that "a spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling." *State v. Lilly*, 717 N.E.2d 322, 325 (Ohio 1999). To determine whether Officer Lang had probable cause to detain Mr. al-Lamadani, we consider the facts and circumstances known to the officer on the night of the incident.

First, to the extent that the defendants dispute whether Officer Lang *knew* that Mr. al-Lamadani had not yet been served with the protection order, this is a factual dispute that we lack jurisdiction to resolve. *See Marvin*, 509 F.3d at 237. The district court's finding that Officer Lang knew that the order had not been served when he handcuffed Mr. al-Lamadani is not "blatantly contradicted by the record," *Scott v. Harris*, 550 U.S. 372, 380 (2007), and therefore "the officers must accept the plaintiff's version of the facts in order for this Court to have jurisdiction over their appeal," *Younes v. Pellerito*, 739 F.3d 885, 889 (6th Cir. 2014). Officer Lang testified that he had seen the protection order before he began his shift earlier that day. He also testified that Mrs. al-Lamadani told him that her husband had just been in London. During Officer Lang's pat-down of Mr. al-Lamadani, Mr. al-Lamadani also stated that he had just

returned from London and knew nothing about a restraining order. The officer's knowledge that the protection order had just been filed that day, coupled with the information that Mr. al-Lamadani had just returned from London, would allow a reasonable factfinder to infer that Officer Lang knew that the protection order had not been served and thus Mr. al-Lamadani was detained without probable cause. Because this version of events is not "so utterly discredited by the record as to be rendered a visible fiction," *Younes*, 739 F.3d at 889 (internal quotation marks omitted), we lack jurisdiction to review this factual dispute.

If Officer Lang knew that Mr. al-Lamadani had not been served with the protection order when he handcuffed him, there is no doubt that he lacked probable cause to detain him. Officer Lang was obligated to consider all exculpatory and inculpatory evidence within his knowledge at the time of the incident. *Gardenhire*, 205 F.3d at 318. If Mr. al-Lamadani had not been served with the protection order, he could not have "knowingly" trespassed in the home. *See* Ohio Rev. Code Ann. § 2911.21. Nor is there any doubt that at the time of the incident it was clearly established that an individual cannot be in violation of a civil protection order when he has not yet been served with the order. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (noting that it is clearly established that the service of process is "fundamental to any procedural imposition on a named defendant"); *see also Mayo v. Macomb Cnty.*, 183 F.3d 554, 557 (6th Cir. 1999) (explaining that there was a "valid" protection order against the plaintiff, which the plaintiff and the officer both confirmed had previously been served on the plaintiff); *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 528–29 (6th Cir. 2009) (finding probable cause to arrest the plaintiff for violation of a protection order where there was no dispute that she had been served). Therefore, in reviewing the purely legal issue of "whether the plaintiff's facts, taken at their best, show that the defendant violated clearly established law," we

conclude that there is evidence in the record upon which a reasonable jury could find that Officer Lang lacked probable cause to seize Mr. al-Lamadani. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013).

The defendants also present an additional legal argument that we may address. They argue that we need not consider whether Officer Lang had probable cause to detain Mr. al-Lamadani, pointing to *Michigan v. Summers*, where the Supreme Court explained that the traditional probable-cause framework does not necessarily apply to "some seizures significantly less intrusive than an arrest" where "the opposing interests in crime prevention and detection and in the police officer's safety could support the seizure as reasonable." 452 U.S. 692, 697–98 (1981) (internal quotation marks omitted). There, the Court held that officers executing a search warrant for contraband may detain occupants of the premises while conducting the search even in the absence of probable cause. *Id.* at 704–05. Such a detention is permissible because "execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702. The Court further reasoned that the character of intrusion caused by detention was "substantially less intrusive" than an arrest, and that the justifications for detention were substantial, notably, preventing flight, protecting officer safety, and facilitating the orderly completion of the search. *Id.* at 702–03. Based on *Summers* and its progeny, the defendants argue that we should apply a reasonable-suspicion standard to Mr. al-Lamadani's detention rather than the more stringent probable-cause requirement.

But *Summers* does not justify departing from the normal probable-cause standard in this case. The defendants are correct that the Supreme Court has said that particularized suspicion that an occupant is involved in criminal activity or poses a specific danger to officers is not

required in order to detain an occupant during the execution of a search warrant at a residence. *Bailey*, 133 S. Ct. at 1037–38; *see also Muehler v. Mena*, 544 U.S. 93, 98 (2005). But the Supreme Court has continued to apply the framework it laid out in *Summers*, which allows for detention absent probable cause when the character of the intrusion caused by the detention is slight and the justifications for detention are substantial. *See Muehler*, 544 U.S. at 100 (holding that governmental interests in detaining and handcuffing a suspect were "at their maximum when . . . a warrant authorizes a search for weapons and a wanted gang member resides on the premises").

The circumstances at the al-Lamadani residence and the interests at stake in investigating the violation of a protection order are not aligned with those at issue in *Summers* and the line of cases that followed it. Of the three factors identified by the Supreme Court in *Summers*—the prevention of flight, officer safety, and facilitating the orderly completion of a search—only the second factor is even implicated in a context where no search for contraband takes place. Indeed, the defendants do not argue that Officer Lang was justified in handcuffing Mr. al-Lamadani to prevent him from fleeing or to facilitate the completion of a search. And the defendants' attempts to justify the application of *Summers* due to the interest in officer safety is unavailing. Mr. al-Lamadani stated that he had no weapons, which Officer Lang's pat-down confirmed. Mrs. al-Lamadani had told both the dispatcher and Officer Lang that Mr. al-Lamadani had not been violent with her that night. When Officer Lang arrived at the house, he could see Mr. al-Lamadani sitting quietly in a chair, and after he entered the house, Mr. al-Lamadani was fully compliant with Officer Lang's instructions.

Our conclusion that *Summers* does not apply here is also consistent with our jurisprudence regarding the reasonableness of handcuffing during street and traffic stops. We

have held that "[i]f there is no specific reason for the officers to believe that the detainee poses a risk of flight or violence, 'a bare inference' or speculation that the detainee may somehow be violent is not sufficient to justify the use of handcuffs." *Brown v. Lewis*, No. 14-1392, 2015 WL 794705, at \*10 (6th Cir. 2015). We have also held that handcuffing was completely lacking in justification when officers stopped a group of youths, conducted illegal pat-down searches of them, and uncovered no weapons. *Bennett v. City of Eastpointe*, 410 F.3d 810, 837 (6th Cir. 2005) ("That makes it truly remarkable (not in a good way) that the officers then handcuffed the youths."). Here, even though Mrs. al-Lamadani told Officer Lang that she did not know if her husband was armed, Officer Lang discovered after questioning him and patting him down that he did not have a weapon. And the defendants have pointed to no threatening conduct on the part of Mr. al-Lamadani beyond Officer Lang's unconvincing assertion that it was not normal for someone to be sitting in a chair and staring straight ahead. Therefore, this case is easily distinguishable from others where we have found handcuffing to be justified in the interest of officer safety. *See, e.g.*, *O'Malley*, 652 F.3d at 670–71 (reversing the denial of qualified immunity where, despite his compliance with the officer's instructions and truthful answers to his questions, the plaintiff told the cop he had a gun in his vehicle and acted angry and agitated, and the officer could not see into the vehicle to determine how close the gun was or whether there were passengers inside); *Fox*, 489 F.3d at 236 ("The facts known to [the officer] included the report from [a supervisor] that plaintiff was armed, that plaintiff purported to be an IRS agent but had not shown [the officer] his credentials, and that plaintiff had been removed from the flight for causing a disturbance.").

We are not persuaded that *Summers* justifies the application of a standard of reasonable suspicion rather than probable cause to the seizure in question here. We therefore affirm the district court's denial of qualified immunity to Officer Lang on the illegal-seizure claim.

### 2. *Excessively forceful handcuffing*

We have held that "unduly tight or excessively forceful handcuffing" violates the Fourth Amendment. *Morrison*, 583 F.3d at 401; *see also Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) ("The right to be free from 'excessively forceful handcuffing' is a clearly established right for qualified immunity purposes."). Such a claim survives summary judgment when there is adequate evidence to create a factual dispute that: (1) the plaintiff complained that the cuffs were too tight; (2) the officer ignored the complaint; and (3) the plaintiff suffered some physical injury as a consequence of the cuffing. *See Morrison*, 583 F.3d at 401.

There is evidence in the record that establishes all three prongs. Officer Lang and Mr. al-Lamadani both testified that Mr. al-Lamadani had complained that the cuffs were too tight. Officer Lang also admitted in deposition that he "[did not] know if [he] checked [the handcuffs], had him stand up to check them again or [] just told him they were fine." Lang Dep., R. 25, PageID 129. This is sufficient to establish a factual dispute about whether Lang ignored Mr. al-Lamadani's complaints. In *Morrison*, the officer testified that he had, in fact, responded to the plaintiff's complaints by sticking his finger between the cuffs and her wrist to make sure they were not too tight. 583 F.3d at 402. However, we found there that a witness's testimony that the officer had refused to loosen the handcuffs, as well as the plaintiff's testimony that the officer had said he was permitted to place the handcuffs on "as tight as he wanted to and that's how they were staying," were sufficient to establish a factual dispute as to the second prong. *Id*.; *cf. Burchett*, 310 F.3d at 945 (granting qualified immunity on an excessively forceful handcuffing

claim where the plaintiff complained of pain only once and the officer immediately offered to remove the cuffs if the plaintiff agreed to cooperate).

Finally, as to the injury requirement, Mr. al-Lamadani testified that the cuffs left a red mark on his left wrist that turned blue and was gone the next day. As the district court pointed out, this injury is nearly identical to the plaintiff's in *Morrison*, where we upheld a denial of summary judgment to defendant-officers on a claim of excessively forceful handcuffing, finding that "bruising and wrist marks create a genuine issue of material fact with regard to the injury prong." 583 F.3d at 403; *see also Burchett*, 310 F.3d at 944 (noting that "applying handcuffs so tightly that the detainee's hands become numb and turn blue certainly raises concerns of excessive force").

We find that viewed in the light most favorable to Mr. al-Lamadani, he has made a showing that Officer Lang violated his constitutional right to be free from excessive force while handcuffed. Next we consider whether the contours of the right were sufficiently clear such that a reasonable officer would understand that he was violating the right by ignoring Mr. al-Lamadani's complaints that the handcuffs were too tight. *Morrison*, 583 F.3d at 400.

The facts of this case are quite similar to those of *Morrison*, which would tend to weigh in favor of finding clearly established law here. However, the defendants argue that *Morrison* is distinguishable because the plaintiff there was subjected to a forty- or fifty-minute period of excessively tight handcuffing. *See Morrison*, 583 F.3d at 403. Citing *al-Kidd*, 131 S. Ct. at 2083, they claim that *Morrison* stands only for a generalized right to be free from unduly tight handcuffing, and that "such a high level of generality" in defining clearly established constitutional rights is improper. They point to two unpublished cases where our court has found that five-minute and ten-minute periods of excessively tight handcuffing did not violate a clearly

established constitutional right. *See Lee v. City of Norwalk, Ohio*, 529 F. App'x 778, 782 (6th Cir. 2013); *Fettes v. Hendershot*, 375 F. App'x 528, 533 (6th Cir. 2010).

But *Morrison* relied on a longer line of cases in which we have held that an officer is not entitled to qualified immunity if the plaintiff has shown a factual dispute as to whether the plaintiff complained that the cuffs were too tight, the officer ignored the complaints, and the plaintiff was injured from the cuffs. *See, e.g.*, *Kostrzewa v. City of Troy*, 247 F.3d 633, 640–41 (6th Cir. 2001) (holding denial of qualified immunity was proper where the plaintiff repeatedly complained that the cuffs were too tight, the officers ignored him, and a doctor later instructed him to elevate and apply ice to his wrists as treatment, after which the officer reapplied the cuffs); *Martin v. Heideman*, 106 F.3d 1308, 1310 (6th Cir. 1997) (reversing grant of qualified immunity where plaintiff complained in the back of the police car and later in a holding cell that his hands were becoming numb and the officer ignored his complaints). These cases, combined with *Morrison*, clearly establish that a plaintiff can make a showing of a constitutional violation based on evidence of the plaintiff's complaint, the officer's refusal to respond, and the plaintiff's injury.

Here, a man was handcuffed in his own house after complying with an officer's demands and answering his questions. A reasonable jury could find that it was unreasonable for Officer Lang not to check Mr. al-Lamadani's handcuffs after he complained of pain while sitting on a chair in his own living room. This is particularly true where it is undisputed that Mr. al-Lamadani was fully compliant with all instructions and Officer Lang was not engaged in a dangerous confrontation. *See Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) ("[W]e point out that [the officer] faced rather benign circumstances that hardly justified his failure to respond more promptly to [the plaintiff's] entreaties, at least to the extent to ascertain if the handcuffs

were too tight. [The officer] was not, after all, in the midst of a dangerous situation involving a serious crime or armed criminals.") As in other types of excessive-force claims, when considering whether a reasonable officer would have known that his actions violated the plaintiff's clearly established constitutional rights, we may take into account the context of the handcuffing and the plaintiff's conduct leading up to the incident. *See Malory v. Whiting*, 489 F. App'x 78, 83 (6th Cir. 2012) (noting that "the confrontation that gave rise to Plaintiff's [excessive-force] claim occurred against the backdrop of conduct by Plaintiff that no reasonable person could have interpreted as threatening" because the plaintiff was compliant with officers when arrested and transported to the station).

We find that Mr. al-Lamadani had a clearly established right to be free of excessively forceful handcuffing. A reasonable officer in this situation would have known that he was required to investigate whether the handcuffs were, in fact, unreasonably tight. Therefore, we affirm the district court's denial of qualified immunity on the excessive-force claim.

## C. Municipal Liability

A municipality may be held liable for an officer's constitutional violation of a plaintiff's rights under a failure-to-train theory if the plaintiff can show that: (1) the training was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). The defendants argue that the district court improperly denied the village's motion for summary judgment because there is no evidence that the village was deliberately indifferent to the need to train its officers. However, Indian Hill is "not entitled to invoke the defense of qualified immunity and therefore has no grounds to seek an interlocutory appeal of the district court's

denial of its motion for summary judgment." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 790. However, an appellate court may exercise pendent appellate jurisdiction over a § 1983 municipal-liability claim where the municipality's motion for summary judgment is "inextricably intertwined with the qualified immunity analysis properly before the Court." *Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 423 (6th Cir. 2007) (internal quotation marks omitted). We have found that a pendent appellate claim is "inextricably intertwined with a properly reviewable claim on collateral appeal" only if "appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Id.* (emphasis original). "[T]he inextricably intertwined requirement is not meant to be loosely applied as a matter of discretion." *Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 503 (6th Cir. 2011) (internal quotation marks omitted).

Here, Officer Lang's liability hinges on whether he violated Mr. al-Lamadani's clearly established constitutional rights, but the municipality's liability turns on its failure to train its officers. The resolution of Officer Lang's interlocutory appeal does not necessarily determine Indian Hill's training obligations because the "resolution of the qualified immunity inquiry does not conclusively determine the municipality's liability." *Lane*, 490 F.3d at 423–24 (citing *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579 (6th Cir. 2003)). Therefore, the municipal-liability claim is not "inextricably intertwined" with the qualified-immunity claim and we lack jurisdiction to consider the village's municipal-liability appeal. *See Martin*, 712 F.3d at 963; *Lane*, 490 F.3d at 424.

## II. CONCLUSION

We affirm the district court's denial of qualified immunity to Officer Lang and dismiss the village's appeal of the denial of summary judgment for lack of jurisdiction.

**MERRITT, Circuit Judge, concurring.** I fully concur in the court's opinion in this case, and I write briefly here to answer directly the dissent's position on excessive force. The dissent may be correct that the force used was not excessive if the arrest had been valid and not a violation of the Fourth Amendment. But here the officer arrested the plaintiff in his own home without a warrant or probable cause or a protective order of any kind or review and approval by a judicial officer. There is no real claim of exigent circumstances or any other basis for putting handcuffs on the plaintiff or exercising any force whatever, much less painful force. Any officer surely ought to know that he has no authority under the Fourth Amendment to mistreat a private, law-abiding citizen in this way. The Fourth Amendment is specifically designed to protect the liberty of the citizen from harmful and insulting governmental action of this kind. This was a "false arrest" at common law and a violation of the Fourth Amendment. In this situation any force used was excessive and damages should be awarded. Therefore, the district court was right to send the case to the jury.

**ALICE M. BATCHELDER, Circuit Judge, Concurring in part and dissenting in part.** I concur with the majority on the unlawful-seizure and failure-to-train claims. As for the excessive-force claim, however, the lead opinion falls into the same trap as the opinion in *Morrison v. Board of Trustees of Green Township*, 583 F.3d 394 (6th Cir. 2009): it conflates the two-step qualified immunity analysis. Because the Supreme Court has disavowed the former manner of handling these claims, in which a court's determination on the merits would dictate the result on qualified immunity, this court must follow the Supreme Court's mandates rather than its own. A failure to do so creates a constitutional requirement for police officers to investigate every handcuff-related complaint. Because the majority's analysis contradicts the Supreme Court's clear guidance on the issue, reaching the wrong result in the process, I respectfully dissent.

The majority roots its holding in both *Morrison* and the long line of cases on which *Morrison* relied "in which [this court] held that an officer is not entitled to qualified immunity if the plaintiff has shown a factual dispute as to whether the plaintiff complained that the cuffs were too tight, the officer ignored the complaints, and the plaintiff was injured from the cuffs." Maj. Op. 16. The latter set of cases is a shaky foundation, however, given intervening Supreme Court precedent. For instance, in *Kostrzewa v. City of Troy*, 247 F.3d 633 (6th Cir. 2001), we noted that "[a]s this circuit has analyzed the qualified immunity issue in excessive force cases, the question of whether the reasonable officer would have known his conduct violated clearly established constitutional rights can be answered by the initial inquiry of whether the officer's use of force was objectively reasonable." *Id.* at 641. That case also noted, however, that the Supreme Court had recently heard argument in a case that presented the issue as to "whether the

test for qualified immunity is the same as the test for reasonableness under the Fourth Amendment." *Id.* at 642 n.5.

The opinion in that Supreme Court case was issued later that year, and it forecloses the conflation of the merits and the qualified-immunity analyses. In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated that courts must look at two distinct questions when determining whether an officer is entitled to qualified immunity: first, "whether a constitutional right would have been violated on the facts alleged" and second, "whether the right was clearly established." *Id.* at 200. And the Court reiterated that rather than focus on "general proposition[s]," a court must ensure that "the right the official is alleged to have violated [was] 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* Thus, the approach the lower court had taken—described by the Court as denying "summary judgment any time a material issue of fact remains on the excessive force claim"—could "undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment'" and was thus improper. *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Thus, to the extent that *Morrison*, despite its being decided after *Saucier*, conflates the merits and the qualified-immunity inquiries, it is inappropriate to rely on that case as dispositive. And it appears that this is exactly what *Morrison* did. The court affirmed the district court's denial of qualified immunity because it ruled that "[Morrison] has offered sufficient evidence to

create a genuine issue of material fact regarding each element of the handcuffing test." *Morrison*, 583 F.3d at 404. This is precisely what the Supreme Court in *Saucier* held to be improper.

Instead of *Morrison*, we should follow the *Saucier*-compliant precedent of *O'Malley v. City of Flint*, 652 F.3d 662 (6th Cir. 2011). In that case, we noted that even when a plaintiff makes a sufficient showing to survive summary judgment on the underlying excessive-force claim, "a defendant officer may still be entitled to summary judgment on the basis of qualified immunity if it would not be clear to a reasonable officer that he was violating the plaintiff's rights." *Id.* at 671. We further noted that "our precedents fail to notify officers that any response to a complaint of tight handcuffing other than an immediate one constitutes excessive force." *Id.* at 672 (quoting *Fettes v. Hendershot*, 375 F. App'x 528, 533 (6th Cir. 2010)). Indeed, "a constitutional requirement obligating officers to stop and investigate each and every utterance of discomfort and make a new judgment as to whether the handcuffs are 'too tight' is neither reasonable nor clearly established." *Id.* (quoting *Fettes*, 375 F. App'x at 533).

The majority held that *Morrison* and the cases on which *Morrison* relied "clearly establish that a plaintiff can make a showing of a constitutional violation based on evidence of the plaintiff's complaint, the officer's refusal to respond, and the plaintiff's injury." Maj. Op. 16. This does exactly what *O'Malley* called unreasonable: it obligates all officers in the future to stop and investigate each and every utterance of discomfort, or else face the specter of a jury trial on an excessive-force claim. Because qualified immunity is meant to protect "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), forcing every officer who does not investigate every utterance of discomfort—no matter how miniscule the complaint or how little time has passed—to go to trial is plainly inappropriate.

Instead, we must look to whether "the contours of a right are sufficiently clear" that "*every* reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (emphasis added) (internal quotation marks omitted). The Supreme Court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* If it has not, qualified immunity will operate "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206 (internal quotation marks omitted).

Here, we have a situation in which an officer handcuffed a man in his home for about fifteen minutes, the man complained just once that his handcuffs were too tight, and the handcuffs left a small red mark that bruised. The cases in which we have found qualified immunity inappropriate featured much more egregious facts. *See, e.g.*, *Morrison*, 583 F.3d at 402–03 (handcuffing for "forty to fifty" minutes that caused skin that was "all pinched over and [] turning black and blue"); *Baskin v. Smith*, 50 F. App'x 731, 737–38 (6th Cir. 2002) (handcuffing for forty-five minutes to an hour that pinched defendant's wrists until they bled); *Martin v. Heideman*, 106 F.3d 1308, 1310 (6th Cir. 1997) (handcuffing for thirty-five minutes that was so tight that defendant's hands became numb and swollen). The cases in which we have found qualified immunity appropriate, on the other hand, were for shorter time periods or featured less noticeable injuries. *See, e.g.*, *Lee v. City of Norwalk*, 529 F. App'x 778, 782 (6th Cir. 2013) (handcuffing for five minutes that led to a wrist contusion); *Fettes*, 375 F. App'x at 533 (handcuffing for ten minutes that led to permanent damaging of the nerves in the wrist, despite defendant's complaining "several times").

While there are differences between our case and the cases in which qualified immunity was found appropriate—most notably that both *Fettes* and *Lee* featured a discrete time period for

the handcuffing while the police car drove to the station, as opposed to our case where the handcuffing was seemingly indefinite in the moment—our case is much more factually similar to *Fettes* and *Lee* than it is to the *Morrison* line of cases. The fifteen-minute time period is much closer to the five- to ten-minute window than the thirty-five- to fifty-minute window and the slight bruising—not visible while the handcuffs were on—is much less noticeable than the pinched over, bleeding, or swollen skin in the *Morrison* line of cases. At the very least, this case falls in the "hazy border" between excessive and acceptable force. Because the time period was so short, the injury so small, and the complaint so minimal, a contrary holding would clearly establish exactly what *O'Malley* feared: a requirement that every officer investigate every utterance of discomfort. If qualified immunity does not protect Officer Lang, it protects no police officer from a jury trial on an excessive-force claim premised on handcuffing.

The underlying excessive-force claim and the qualified-immunity inquiry have two different analyses in view. The underlying excessive-force claim asks whether Officer Lang was objectively unreasonable in his use of handcuffs, such that he violated al-Lamadani's constitutional rights. The district court denied summary judgment on that claim, holding that there was a genuine dispute of material fact as to the officer's reasonableness. The qualified immunity inquiry, however, asks a slightly, but significantly, different question. It asks whether every reasonable officer would have known that he was violating al-Lamadani's constitutional rights through the use of handcuffs in this factual situation. It cares about more than one officer's reasonableness; it looks to *every* officer's reasonableness. Because the majority conflated the two analyses, and because I believe that this situation falls at the very least in the "hazy border" between excessive and acceptable force such that a reasonable officer would have

thought himself not to be violating al-Lamadani's rights, I respectfully dissent from the majority's excessive-force ruling.